*188
 
 Opinion
 

 FRIEDMAN, Acting P. J.
 

 In 1973, at the instance of Inyo County, this court issued a writ of mandate directing the City of Los Angeles and its department of water and power to prepare an environmental impact report (EIR) covering their extraction of subsurface water in the Owens Valley.
 
 (County of Inyo
 
 v.
 
 Yorty
 
 (1973) 32 Cal.App.3d 795, 814-816 [108 Cal.Rptr. 377].) In August 1976 the City of Los Angeles filed its return to the writ, submitting its final EIR, which had been approved and certified by its board of water and power commissioners on July 15, 1976.
 
 [1]
 
 Inyo County, the petitioner, has objected to the return, charging that the final EIR fails to comply with the requisites of the California Environmental Quality Act (CEQA).
 
 [2]
 
 We sustain the county’s objection.
 

 We shall not extend this opinion by narrating the history of Los Angeles’ acquisition of extensive lands and water rights in the Owens Valley and its establishment of a system for exporting water to the City of Los Angeles. Nor do we describe the prior events in this litigation. The unconversant reader should read
 
 County of Inyo
 
 v.
 
 Yorty, supra,
 
 32 Cal.App.3d 795, and
 
 County of Inyo
 
 v.
 
 City of Los Angeles
 
 (1976) 61 Cal.App.3d 91 [132 Cal.Rptr. 167], to comprehend the present decision adequately. We shall refer to portions of these two earlier opinions only to explain and support our present decision.
 

 Section 21151 of CEQA directs all local agencies (here, the Board of Water and Power Commissioners of the City of Los Angeles) to prepare and certify the completion of an EIR on any project they intend to carry out or approve which may have a significant effect on the environment. The term “project” is sparsely defined as including “activities directly undertaken by any public agency.” (§ 21065.) When the law requires preparation of an EIR, it must be considered by every public agency before it approves or disapproves the project. (§ 21061; guidelines, Cal. Admin. Code, tit. 14, § 15012;
 
 No Oil, Inc.
 
 v.
 
 City of Los Angeles
 
 (1974) 13 Cal.3d 68, 79-80, fn. 8 [118 Cal.Rptr. 34, 529 P.2d 66].)
 

 
 *189
 
 Consideration of a filed EIR’s adequacy is a judicial function.
 
 (Environmental Defense Fund, Inc.
 
 v.
 
 Coastside County Water Dist.
 
 (1972) 27 Cal.App.3d 695, 704 [104 Cal.Rptr. 197].) In a lawsuit charging noncompliance with CEQA, judicial inquiry is limited to the question of abuse of discretion, which is established if the agency has not proceeded as required by law or if its decision is not supported by substantial evidence. (§ 21168.5;
 
 No Oil, Inc.
 
 v.
 
 City of Los Angeles, supra,
 
 13 Cal.3d at p. 74.) The court does not pass upon the correctness of the EIR’s environmental conclusions, but only upon its sufficiency as an informative document.
 
 (Plan for Arcadia, Inc.
 
 v.
 
 City Council of Arcadia
 
 (1974) 42 Cal.App.3d 712, 725-726 [117 Cal.Rptr. 96];
 
 Environmental Defense Fund, Inc.
 
 v.
 
 Coastside County Water Dist., supra,
 
 27 Cal.App.3d at p. 705; see also
 
 San Francisco Ecology Center
 
 v.
 
 City and County of San Francisco
 
 (1975) 48 Cal.App.3d 584, 593 [122 Cal.Rptr. 100].)
 

 I
 

 Volume I of the final EIR commences with a section entitled “Project Definition and Objectives.” In its entirety the section reads as follows;
 

 “The Third District Appellate Court in
 
 County of Inyo
 
 v.
 
 Yorty
 
 (32 C.A.3d 795) found that the ‘expanded groundwater extraction was a “project” separate and divisible from the Second Aqueduct’ (32 C.A.3d 806) and that an EIR was required on the increased pumping.
 

 “The project is an increase in pumping from 89 cubic feet per second (cfs) to 140 cfs measured on a long-term average and from 250 cfs to 315 cfs during the highest single year. The increased puming [sic] is necessary to supply uses of water on City of Los Angeles lands in Inyo and Mono Counties that were not anticipated in 1963 when the Second Aqueduct project was adopted. Those uses consist of greater irrigation for ranching, recreation, fish and wildlife habitat projects, expansion of two fish hatcheries, and domestic supplies for the towns.”
 

 So described, the project consists of a proposed increase of 51 cfs in the long-term subsurface extraction rate and an increase of 65 cfs in the high-year rate, these increases being destined solely for “unanticipated” uses within the Owens Valley. So described, the project excludes subsurface extractions designed for export to Los Angeles via the department’s twin aqueduct system.
 

 
 *190
 
 The EIR, however, discusses proposals far broader than the initially described project. Indeed, the project concept expands and contracts from place to place within the EIR. These conceptual fluctuations are particularly distinct in an EIR section entitled “Recommended Project.” This section opens by focusing on the EIR’s initial, narrow project description.
 
 [3]
 
 Next, it adopts a somewhat broader stance, referring to the designated “project” as one part of the larger operation of the Los Angeles Aqueduct System, thus impelling a “reappraisal” of the rate of export through the aqueducts. This statement provides a transition to a yet wider description of the recommended project, which appears in the footnote below.
 
 [4]
 

 As compared with the initially defined project, that is, pumping for unanticipated Owens Valley needs, the “recommended project” represents a vastly enlarged concept. It includes a number of described technical features, including: 'concrete-lining two canals to reduce percolation to the groundwater basin; in years of high runoff, exportation of additional water from the Owens Valley for the purpose of recharging the San Fernando groundwater basin in Los Angeles County; a water conservation program within the City of Los Angeles; rearrangement of Owens Valley reservoir operations in dry years by cutting the export rate as well as the supply of irrigation water within the valley; reduction of stockwater supplied within the Owens River basin from 18,600 to 5,600 acre-feet; extraction of groundwater at a long-term average pumping rate of 140 cfs and a high-year average of 315 cfs for export via the twin aqueducts as well as for in-valley use.
 

 Two sections of the final EIR describe the recommended project’s environmental impact within the Owens Valley. (Vol. I, pp. B-5 to B-13; vol. II, ch. 6, part A.) Inferably, the environmental forecasts are premised upon the 140 cfs long-term extraction rate of the “recommended project” rather than the 51 cfs increase specified in the officially described
 
 *191
 
 “project.”
 
 [5]
 
 In general, pumping at a long-term rate of 140 cfs would lower the water table of the subsurface basin 10 to 15 feet, altering the ecosystem of the valley floor. Descent of the water table would cause irreversible changes in the pattern of natural vegetation, replacing moisture-loving plants with semidesert species; in some zones decreases in vegetative cover would expose the soil to wind erosion, causing seasonal increases of atmospheric dust. (Final EIR, vol. I, pp. B-5 to B-9; C-13 to C-28.) The shift in the character of the vegetation community would have an impact on fauna, reducing but not eliminating the population of certain animal species.
 
 (Id.,
 
 pp. B-9 to B-11.)
 

 After its completion by the department’s staff the final EIR was submitted to the Board of Water and Power Commissioners of the City of Los Angeles. On July 15, 1976, the board adopted a resolution approving the EIR and the “proposed project.” The approval resolution commences with an explanation of the project’s character; the explanation, as we interpret it, parallels the narrowly restricted project description at the outset of the EIR; the explanation excludes from the project the 89 cfs rate of subsurface extractions designed for export via the Los Angeles aqueduct system. Following that explanation the resolution describes the essential factors of “the proposed increased groundwater pumping project” and approves the project so described.
 
 [6]
 

 
 *192
 
 II
 

 The EIR is the heart of the environmental control process.
 
 (County of Inyo
 
 v.
 
 Yorty, supra,
 
 32 Cal.App.3d at p. 810.) CEQA describes the report’s purpose—to provide the public and governmental decision-makers (here, the board of water and power commissioners) with detailed information of the project’s likely effect on the environment; to describe ways of minimizing significant effects; to point out alternatives to the project. (§§ 21002.1, 21061, 21100;
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors
 
 (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049].) The EIR process facilitates CEQA’s policy of supplying citizen input. (See
 
 People
 
 v.
 
 County of Kern
 
 (1974) 39 Cal.App.3d 830, 841 [115 Cal.Rptr. 67].) By depicting the project’s unavoidable effects, mitigation measures and alternatives, the report furnishes the decision-maker information enabling it to balance the project’s benefit against environmental cost. (See § 21100;
 
 Environmental Defense Fund, Inc.
 
 v.
 
 Coastside County Water Dist., supra,
 
 27 Cal.App.3d at p. 705.) The report should function as an environmental “alarm bell.”
 
 (County of Inyo
 
 v.
 
 Yorty, supra,
 
 32 Cal.App.3d at p. 810.)
 

 CEQA defines “project” only by the synonymous term “activity.” (§ 21065; cf.
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors, supra,
 
 8 Cal.3d at pp. 260-262.) In most cases the scope and character of the proposed activity will be clear; when they are not, they can be discerned only in the light of CEQA’s policy to “ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.” (§ 21001, subd. (d).) The CEQA Guidelines flesh out the “project” concept by referring to it as “the whole of an action, which has a potential for resulting in a physical change in the envirornment, directly or ultimately. . . .” (Cal.Admin.Code, tit. 14, § 15037, subd. (a).) Commenting on the comparable provisions of the National Environmental Policy Act, the federal Supreme Court has pointed out that an accurate description of the project is necessary in order to decide what kind of environmental impact statement need be prepared.
 
 (Aberdeen & Rockfish R. Co.
 
 v.
 
 SCRAP
 
 (1975) 422 U.S. 289, 322 [45 L.Ed.2d 191, 216, 95 S.Ct. 2336]; see also
 
 Swain
 
 v.
 
 Brinegar
 
 (7th Cir. 1976) 542 F.2d 364, 369.)
 

 A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal’s benefit against its environmental cost, consider mitigation measures,
 
 *193
 
 assess the advantage of terminating the proposal (i.e., the “no project” alternative) and weigh other alternatives in the balance. An accurate, stable and finite project description is the
 
 sine qua non
 
 of an informative and legally sufficient EIR.
 

 In terms of legal sufficiency, the Los Angeles EIR’s narrow project description presents two salient features: first, the assumption that subsurface water produced by a long-term pumping rate of 89 cfs and a high-year rate of 250 cfs is outside the “project,” available for export as part of the total flow of 666 cfs and immune from CEQA’s demands; second, the assumption that the project is confined to increased groundwater extraction (that is, a net increase of 51 cfs in the long-term rate and of 65 cfs in the high-year rate) destined solely for use on city-owned lands in Inyo and Mono Counties.
 

 These postulates represent an egregious misinterpretation of this court’s 1973 decision. They create the foundation for an EIR which falls short of the letter and spirit of the California Environmental Quality Act and fails to satisfy the writ of mandate issued by this court in 1973.
 

 This lawsuit had its origin in an equity action instituted by Inyo County and moved by change of venue to Sacramento County. In its first amended complaint, filed in November 1972, Inyo County sought injunctive restraints upon the extraction of subsurface water for export from the Owens Valley and against utilization of subsurface water in place of surface water within Inyo County.
 
 [7]
 
 The complaint also sought a mandatory injunction requiring one or more EIRs.
 

 At that point the focus of the lawsuit was clear—its primary aim was protection of subsurface water aquifers against pumping for the purpose of exportation to Los Angeles; secondarily, it sought to restrict utilization of underground water as a substitute for surface water diverted from in-valley uses to exportation.
 

 At that stage of the litigation, the city insisted that exportation of increased groundwater was an inseparable part of its second aqueduct, an “ongoing project” completed prior to the effective date of CEQA and thus immune from the demands of CEQA. In a declaration filed early in the litigation Duane L. Georgeson, aqueduct engineer in charge of the
 
 *194
 
 city’s water-gathering operations in the Owens Valley, stated: “Although ground water pumping for export has been carried on historically since 1917, expansion of ground water pumping by the Department is part and parcel of the Second Barrel or Second Los Angeles Aqueduct. ... At all times the utilization of Owens Valley ground water and increased ground water pumping have been part and parcel of the Second Los Angeles Aqueduct project. But for the construction of the Second Los Angeles Aqueduct there would have been no need for Los Angeles to increase ground water pumping on a long term average. . . . [H] The increased utilization of water underlying City-owned land in Inyo County is and has been a significant part of the reason for the construction of the Second Los Angeles Aqueduct and the expenditure of $91,200,000 by the Department. As stated, but for the construction of the Second Los Angeles Aqueduct there would be no reason to increase long term ground water extraction.”
 
 [8]
 

 Thus the City of Los Angeles joined Inyo County in recognizing the primary focus of the lawsuit—increased utilization of groundwater following the second aqueduct’s availability for use. After the superior court denied Inyo County’s request for a preliminary injunction, the county filed an appeal and an application for supersedeas in this court. We chose to treat the latter as a petition for mandate and issued an alternative writ. That proceeding culminated in our decision of June 1973 in
 
 County of Inyo
 
 v.
 
 Yorty, supra.
 
 At numerous points our decision manifested a continued understanding that the proposed increase of groundwater exportation via the two aqueducts supplied the impetus for the lawsuit and formed its primary concern. We observed: “Narrowly stated, the issue before us is whether City is required to file an EIR with reference to its continued extraction of subsurface waters from the Owens Valley area of County.” (32 Cal.App.3d at p. 798.)
 

 We rejected the city’s “ongoing project” argument, stating: “While the capacity of both aqueducts was known and presumably fixed irrevocably from the period of planning and design onward (666 cfs), the actual extraction of subsurface water has steadily increased from a long-term average 10.3 cfs during the 35-year period 1935 to 1969, to an estimated 89 cfs in 1963, to an existing capacity of 248 cfs in 1971, to an ultimate capacity of 415 cfs estimated in 1971, to an ultimate pumping capacity of 485 cfs estimated in October 1972. In short, while the capacity of the
 
 *195
 
 second aqueduct was fixed and known for a number of years before CEQA, the effect of its construction on subsurface water extraction has been a variable but steady escalation, dependent in large part, no doubt, upon the extent of seasonal rain and snowfall from year to year. Thus the ecological impact of the second aqueduct, viewed in conjunction with the underground pumping and measured by the quantity of extraction, has not been fixed but has substantially increased in severity in the period before, during and after its construction. . . . [H] We conclude from the foregoing that the legislative intent so strongly expressed in CEQA can be met only by considering the expanded groundwater extraction as a ‘project’ separate and divisible from the second aqueduct, and we so treat it.” (32 Cal.App.3d at p. 806.)
 

 The final EIR utilizes the last-quoted statement as the departure point for a serious misinterpretation. We had drawn a distinction between the second aqueduct, the physical project completed prior to CEQA, and the CEQA-subject program of expanded groundwater extraction.
 
 [9]
 
 By an ex parte stroke of the pen, the project definition of the final EIR subtracts a long-term average pumping rate of 89 cfs (i.e., 64,436 acre-feet per year) and a high-year pumping rate of 250 cfs (181,000 acre-feet) from the CEQA-subject side of the line and places it on the exempt side of the line. The EIR views the 89 cfs and the 250 cfs pumping rates as nothing but a baseline from which to describe the CEQA-subject project; the latter, by a process of verbal transmutation, will now be devoted to in-valley use and not exported at all. Such are the assumptions underlying the project description of the final EIR.
 

 These assumptions are fallacious. The final EIR represents an ex parte attempt to narrow the city’s CEQA obligation—and the scope of this lawsuit—down to the relatively small flow of underground water destined for in-valley use. The Genesis account of creation draws a figurative line between the water above the firmament and that below. The authors of the final EIR have essayed a similarly figurative line, dividing subsurface waters according to their destination. This was not the line drawn by our June 1973 interpretation of CEQA. According to that interpretation, increased pumping for export via the two aqueducts
 
 *196
 
 was included in the CEQA-subject project. The EIR’s project description excludes that pumping and contradicts that interpretation.
 
 [10]
 

 At the outset of the EIR process the department of water and power had recognized the uncertainty of its homemade project description. The department released a draft EIR in August 1974, followed by a revised draft in January 1975, both of which were circulated for comment by interested persons and agencies. The revised draft (Final EIR, vol. II, p. 1-1) acknowledges that “there were significantly different interpretations of the Appellate Court’s decision with regard to the definition of the project.”
 
 [11]
 

 In any objective view the outlines of the “project” conceived by our 1973 decision were quite clear. They were clear in 1973 and they are clear now. Unfortunately there is a limit to the precision of words. Judicial opinion writers cannot always armor their language against wishful misinterpretation. At the risk of future misinterpretation we shall attempt the following reformulation of our 1973 formulation: The project which forms both the scope of this litigatiort and the subject of the EIR mandated by this court is the department of water and power’s program for increasing the average rate of groundwater extraction and use (both for export and in-valley use) above a baseline rate reasonably representing the average rate of groundwater extraction and use (both for export and in-valley use) preceding the second aqueduct’s availability for use.
 
 [12]
 

 
 *197
 
 III
 

 As we have observed, the Los Angeles EIR does not cling to its truncated project description. Rather, it shifts from that description to a “reappraisal” of the rate of water export and then to a third concept called the “recommended project.” The recommended project includes not only the rate of groundwater extraction but also the management of exports of mixed surface and subsurface water arriving in Los Angeles via the twin aqueducts. Its features are summarized in the approval resolution of the board of water and power commissioners; they are quoted in footnote 6,
 
 ante.
 

 The elasticity of the project concept does not vitally affect the “impact” sections of the report. The forecasts of environmental consequences in the Owens Valley are premised upon a long-term pumping rate of 140 cfs, which approximates the “project” as conceived in this court’s decision of June 1973. (See fn. 12,
 
 ante,
 
 and accompanying text.) Thus the informative quality of the EIR’s environmental forecasts is not affected by the ill-conceived, initial project description.
 

 Inyo County strongly criticizes the environmental impact sections of the EIR, charging that the report understates the harm to flora and fauna of the Owens Valley and fails to describe air pollution potentialities. Courts are not equipped to select among the conflicting opinions of warring experts. It is not the function of the court to determine the accuracy of the report’s environmental forecasts.
 
 (Plan for Arcadia, Inc.
 
 v.
 
 City Council, supra,
 
 42 Cal.App.3d at pp. 725-726; see Gelpe & Tarlock,
 
 The Uses of Scientific Information in Environmental Decision-making
 
 (1974) 48 So.Cal.L.Rev. 371, 407-411.) Reasonable foreseeability is enough.
 
 (Scientists’ Inst. For Pub. Info., Inc.
 
 v.
 
 Atomic Energy Com’n
 
 (D.C.Cir. 1973) 481 F.2d 1079, 1092 [156 App.D.C. 395].)
 

 The incessant shifts among different project descriptions do vitiate the city’s EIR process as a vehicle for intelligent public participation. The city contends that dissemination of information to the general public was not a statutory objective of CEQA at the time of the EIR process, which was completed in July 1976. Section 21061 of CEQA now declares that an environmental impact report’s purpose is to provide public agencies and the public in general with detailed information concerning the proposed project’s likely environmental effects. The phrase “and the public in general” was inserted as the result of a 1976
 
 *198
 
 amendment which did not become effective until November 30, 1976. (Stats. 1976, ch. 1312.)
 

 The contention is incorrect. Before the 1976 amendment the courts had discerned in CEQA a purpose to assure general public input both in the formulation of the EIR and in the ultimate governmental decision.
 
 (Friends of Mammoth
 
 v.
 
 Board of Supervisors, supra,
 
 8 Cal.3d at p. 263, fn. 8;
 
 Environmental Defense Fund, Inc.
 
 v.
 
 Coastside County Water Dist., supra,
 
 27 Cal.App.3d at p. 705;
 
 People
 
 v.
 
 County of Kern, supra,
 
 39 Cal.App.3d at p. 841; see Guidelines, Cal. Admin. Code, tit. 14, § 15164.) The 1976 amendment did no more than articulate a preexisting, implied demand.
 

 A curtailed, enigmatic or unstable project description draws a red herring across the path of public input. Among the public comments in the final EIR were many objections and expressions of uncertainty aroused by the department’s homemade project description. In general, critics charged that the city’s real objective was the long-term exportation of 666 cfs of ground and surface water via the Los Angeles aqueducts, rather
 
 than the
 
 narrow proposal to augment groundwater extraction for “unanticipated” uses within the Owens Valley; that a long-continued draft of 666 cfs would dwarf the environmental damage caused by the relatively minor increase of groundwater pumping for in-valley use.
 

 One authoritative comment emanated from the State Water Resources Board. In an April 1975 memorandum which was subsequently forwarded to the city, the board’s executive officer declared: “Our basic concern with both the draft EIR and the [revised draft] is that the ‘project’ is considered improperly within the meaning of the California Environmental Quality Act. . . . The descriptions of project features and analysis of impacts are almost entirely focused on the pumping of groundwater and its use on city-owned lands within Mono and Inyo Counties. The effect of preparing the [revised draft EIR] in this manner is to divert attention from the impacts of the major project which is importation of additional water to Los Angeles.”
 
 [13]
 

 
 *199
 
 In its own comments on the revised draft EIR, Inyo County complained: “The document leaves the reader quite confused as to the objectives . . . The revised draft EIR purports to be an EIR on a reassessment of city policies regarding the use of water on city lands in the Owens Valley while at the same time it seems to assume the filling of the second aqueduct.” (Final EIR, vol. III, appen. 2.)
 

 Similar comments were received from other sources. The final EIR rejected all these criticisms, declaring: “Project is increased pumping for uses on City lands in Mono and Inyo Counties. Second Aqueduct is a separate part of DWP operations. The pumping rate above which the increase takes place is 89 cfs measured on a long-term average and 250 cfs measured on a one-year average.”
 
 (Id.,
 
 vol. I, p. A-7.)
 

 The small-scale groundwater project described at the outset was dwarfed by the “recommended project” ultimately endorsed by the final EIR and approved by the board of commissioners. Commencing with its modest proposal to pump an additional 51 cfs for “unanticipated” uses within the Owens Valley, the final EIR became the vehicle for an approval resolution dealing with important, large-scale phases of the city aqueduct management program. Massive fruits blossomed from the tiny seed of the initial project description—dry-year curtailment and wet-year expansion of combined surface and subsurface exportation in unspecified quantities; storage of Owens Valley water in the subsurface basin of the San Fernando Valley in Los Angeles County; construction of a pipeline in the San Fernando Valley; a water conservation program within the City of Los Angeles through an intensified public education effort.
 
 [11]
 

 We reiterate—an accurate, stable and finite project description is the
 
 sine qua non
 
 of an informative and legally sufficient EIR. The defined project and not some different project must be the EIR’s bona fide subject. The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal.
 
 (Bozung
 
 v.
 
 Local Agency Formation Com.
 
 (1975) 13 Cal.3d 263, 284-285 [118 Cal.Rptr. 249, 529 P.2d 1017].) Here, in contrast, the interrelated character of the proposals was known in advance. Here, the selection of a narrow project as the launching pad for
 
 *200
 
 a vastly wider proposal frustrated CEQA’s public information aims. The department’s calculated selection
 
 of its
 
 truncated project concept was not an abstract violation of CEQA. In formulating the EIR, the department of water and power did not proceed “in a manner required by law.” (§21168.5.)
 

 IV
 

 An EIR must describe all reasonable alternatives to the project. (§ 21061; Guidelines, Cal.Admin.Code, tit. 14, § 15143, subd. (d).) We summarize the six alternatives listed in the final EIR:
 

 Alternative 1 would supply city-owned lands with water generated by a long-term pumping rate of 180 cfs (less 89 cfs destined for export) and a high-year average of 385 cfs. This rate of pumping would “cause changes in native vegetation over comparatively large areas on the valley floor.” (Final EIR, vol. II, p. 3-16.)
 

 Alternative 2 would continue existing water uses on city land within the valley but reduce groundwater extraction to a long-term average rate of 100 cfs (including the 89 cfs designed for export). Rate of deliveries for consumptive use would be sustained by lining the canals and ditches with concrete and preventing water seepage into the underground basin. A high capital cost, some damage to vegetation and a dimunition of subsurface recharge are foreseen.
 
 (Id.,
 
 p. 3-17.)
 

 Alternative 3 offers a long-term pumping rate of 140 cfs (including 89 cfs designed for export) and a high-year average of 345 cfs. It would distribute the water differently among the various categories of the city’s Owens Valley commitments, reducing the proportion available for irrigation.
 
 (Id.,
 
 p. 3-17.)
 

 Alternative 4 would reduce total groundwater pumping to a long-term rate of 90 cfs (including 89 cfs available for the aqueducts), reducing irrigated acreage from 18,700 to 1,600 acres and providing groundwater primarily for town domestic supplies. It would substantially reduce the local cattle industry, damage the local economy and turn irrigated acreage into “rabbitbrush scrubland.”
 
 (Id.,
 
 at p. 3-18.) According to the report, the curtailment of cattle-raising would prevent over-grazing, provide more forage for wildlife, make the area more available for ecology classes, sight-seeing, fossil collection and other pastimes.
 
 (Id.,
 
 p. 3-8.)
 

 
 *201
 
 Alternative 5 proposes a total groundwater pumping rate of 90 cfs, the maintenance of existing rates of supply to Owens Valley uses and a 90 cfs reduction in exportation via the aqueducts. The 90 cfs reduction in aqueduct deliveries to the Los Angeles area would be replaced by the purchase of water from the Metropolitan Water District. The purchase price of water and the power costs would add about $7 million per year to the operating expenses of the department of water and power.
 
 (Id.,
 
 at p. 3-18.)
 

 Alternative 6 would combine alternatives 4 and 5. It would severely restrict deliveries to city lands within the Owens Valley, curtail the aqueduct export by 90 cfs and require purchase of replacement water from the Metropolitan Water District. The subsurface basin would be pumped at only 10 cfs to supply the towns within the Owens Valley.
 
 (Id.,
 
 p. 3-19.) This alternative would severely affect the cattle-raising economy of Inyo County which depends almost entirely on city-owned lands.
 
 (Id.,
 
 p. 3-15.) Alternative 6 is the last of the project alternatives enumerated in the final EIR.
 

 The final EIR describes these options as alternatives “relative to the uses of water on city-owned lands and the export of water to Los Angeles.”
 
 (Id.,
 
 vol. II, p. 3-1.) They are, for the most part, conceived as choices to be weighed against the impermissibly truncated project for increasing the groundwater extraction by 51 cfs.
 

 Alternative 1 proposes pumping a net increase of 91 instead of 51 cfs for the identical in-valley uses; it is not a meaningful alternative to the “project” for it simply proposes greater environmental invasion for the same purposes. (See § 21002.) Alternative 3 is no more meaningful. It apparently assumes combined long-term pumping of 89 cfs for export and 51 cfs for the uses described in the artificially curtailed project description. It offers a management or distribution alternative, not an environmentally significant alternative.
 

 Although alternative 4 is not labeled as the “no project alternative,” the city asserts that it is actually tendered for that purpose. It fails to fulfill that purpose. In order to mark out a “no project alternative,” the EIR should describe what condition or program preceded the project. Alternative 4 does not portray the pre-project stage; does not describe what quantities of water from what surface or subsurface sources were supplied to what lands. The litigation record supplies some helpful data. For many years before the construction of the second aqueduct the city
 
 *202
 
 had supplied irrigation water (surface and subsurface) to ranchers on city-owned lands. The 1963 report on feasibility of the Second Los Angeles Aqueduct stated that total Inyo-Mono acreage (inclusive of Indian lands) then supplied with city irrigation water was 40,117 acres, of which 31,817 acres were supplied on an interruptible basis. (1963 Report, vol. VI, p. 6-13.) In 1973, 10 years later, Mr. Georgeson filed an affidavit in the Sacramento Superior Court proceeding, stating that approximately 19,000 acres of city-leased land (11,000 in Inyo County and 8,000 in Mono County) were being supplied with irrigation water. The project, described in the EIR would supply subsurface water for uses “not anticipated” in 1963, when the second aqueduct was planned. As a purported “no project” alternative to fulfilling these unanticipated uses, alternative 4 would deny water to both anticipated and unanticipated uses, including the bulk of land supplied in 1963. Alternative 4 offers a synthetically conceived election between the synthetically conceived project and destruction of the Owens Valley cattle industry. The EIR’s project description and its purported “no project” alternative simply do not match.
 

 Alternatives 2 and 5 represent true alternatives to the narrowly described project. The latter would reduce exports and utilize the reduction as a substitute for the proposed 51 cfs increase in groundwater extraction. Alternative 6 is much broader than alternative 4; it echoes the latter’s threat to choke off water supplied to ranchers who had been receiving it in 1963. In the latter respect, it is not a genuine “no project” alternative.
 

 Collectively, the list of alternatives does not match the project as conceived in this court’s 1973 decision. On the assumption that 10 cfs was the average pumping rate preceding the second aqueduct’s availability and that the proposed average extraction will be 140 cfs, the CEQAsubject project within the .range of this court’s writ of mandate would consist of a net increase of 130 cfs in the average pumping rate, designed both for export and in-valley use. Exported water will never return to the Owens Valley aquifers; some locally used water will. The environmental consequences of a program for mixed export and local use are necessarily different from those emanating from local use alone. The alternatives to a net increase of 130 cfs for mixed export and local use are quite different from the alternatives to a net increase of 51 cfs for local use alone. The EIR embodies a distinct refusal to view the 130 cfs increase as a “project” and offers no alternatives to it.
 

 
 *203
 
 Alternatives 5 and 6 embody a proposal for abstention from increasing the draw on the Owens Valley groundwater basin, for reduction of exports, utilization of the reduction for in-valley needs and purchase of replacement water from an outside source for use in Los Angeles. That proposal presents the board of water and power commissioners with a choice between economic and environmental values. The underlying policy and express provisions of CEQA limit the approving agency’s power to authorize an environmentally harmful proposal when an economically feasible alternative is available. (§§ 21002, 21002.1, subd. (c); see also
 
 Friends of Mammoth
 
 v.
 
 Board of Supervisors, supra,
 
 8 Cal.3d at p. 263, fn. 8;
 
 San Francisco Ecology Center
 
 v.
 
 City and County of San Francisco, supra,
 
 48 Cal.App.3d at pp. 590-591; Younger,
 
 Environmental Protection in California: Perspective Of The Attorney General
 
 (1974) 5 Pacific L.J., 19.) Notably, the Los Angeles EIR omits another alternative, one freighted with costs other than dollars. The omitted alternative is a tangible, foreseeably effective plan for achieving distinctly articulated water conservation goals within the Los Angeles service area. It is doubtful whether an EIR can fulfill CEQA’s demands without proposing so obvious an alternative.
 

 A major function of an EIR is “to ensure that all reasonable alternatives to proposed projects are thoroughly assessed by the responsible official” or board.
 
 (Wildlife Alive
 
 v.
 
 Chickering
 
 (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 533 P.2d 537].) The report must describe all reasonable alternatives to the project including those capable of reducing or eliminating environmental effects; the specific alternative of “no project” must also be evaluated. (§§ 21002, 21100; Guidelines, Cal.Admin.Code, tit. 14, § 15143, subd. (d).)
 

 Because the final EIR does not include a genuine “no project” alternative, because its list of alternatives is not tied to a reasonably conceived or consistently viewed project, the Los Angeles EIR does not comply with CEQA’s demand for meaningful alternatives. This lack results in an EIR which does not meet CEQA’s goal of ensuring that “the long-term protection of the environment shall be the guiding criterion in public decisions.” (§ 21001, subd. (d).)
 

 V '
 

 As we stated at the outset, we sustain Inyo County’s objection to the city’s return to the writ of mandate, holding that the EIR prepared by the department of water and power fails to comply with CEQA. The
 
 *204
 
 parties, as well as amici curiae, have raised other questions, including legality of the approval resolution of the Board of Water and Power Commissioners. These questions broaden the issues beyond those entailed in the measurement of the EIR’s sufficiency; hence we do not examine them. It is enough to say that the final EIR falls short of compliance with the California Environmental Quality Act; that a legally sufficient EIR is a precondition to legality of the public agency’s approval resolution (§ 21151; see
 
 People
 
 v.
 
 County of Kern, supra,
 
 39 Cal.App.3d 830;
 
 Environmental Defense Fund, Inc.
 
 v.
 
 Coastside County Water Dist., supra,
 
 27 Cal.App.3d at pp. 703-704); that this court’s peremptory writ of mandate will not be satisifed until a valid EIR is prepared, certified and filed.
 

 The perimeters of this lawsuit do not necessarily mark the boundaries of the city’s CEQA-imposed obligations. Our writ of mandate directs the preparation of a legally sufficient EIR covering the projected increase of subsurface drawdown in the Owens Valley. “The subsurface water which forms the subject of this lawsuit is one component of an integrated array of water resources—surface runoff, natural and artificial reservoirs, springs, groundwater basins, and transport facilities. Control over such an array permits shifts from one source to another as natural needs or management desires may dictate.”
 
 (County of Inyo
 
 v.
 
 City of Los Angeles, supra,
 
 61 Cal.App.3d at p. 100.) Increased utilization and changes in management of these integrated water resources resulting from completion of the second aqueduct may itself constitute a project or an integrated series of projects calling for a comprehensive EIR. In a comment to the department of water and power dated April 4, 1975, the state Attorney General noted: “The legal question presented to the Court of Appeal [in
 
 County of Inyo
 
 v.
 
 Yorty, supra,
 
 32 Cal.App.3d 795] was not broad enough to include the issue of CEQA’s application to Los Angeles’ entire water management activities.” The Attorney General observed that a “serious unresolved legal question” exists whether the Department of Water and Power must prepare an EIR covering its “ultimate project.” (Vol. III, Final EIR, appen. 2.)
 
 [15]
 

 
 *205
 
 A public agency need not and should not await the compulsion of judicial decrees before fulfilling the demands of CEQA. In a related context a federal court has declared: “To make faithful execution of this duty contingent upon the vigilance and diligence of particular environmental plaintiffs would encourage attempts by agencies to evade their important responsibilities. It is up to the agency, not the public, to ensure compliance with [the environmental control statute] in the first instance.”
 
 (City of Davis
 
 v.
 
 Coleman
 
 (9th Cir. 1975) 521 F.2d 661, 678.) We indulge in this deliberate dictum for two reasons: first, to avoid any implication that compliance with our writ of mandate is the full measure of the department’s CEQA-imposed obligations, and second, to express this court’s willingness to review legal sufficiency of the city’s environmental report on groundwater extractions even though it is included within an EIR of larger scope.
 

 We hold that the city’s return to the writ of mandate issued as a result of our June 1973 decision fails to comply with the writ. This court has continuing jurisdiction to enforce the writ until it is fully satisfied. (Code Civ. Proc., § 1097;
 
 County of Inyo
 
 v.
 
 City of Los Angeles, supra,
 
 61 Cal.App.3d at p. 95.) The writ is not discharged but remains in force; the City of Los Angeles and its department of water and power are directed to take reasonably expeditious action to comply with it. Interim restraints upon the rate of extraction of groundwater and upon the decrease of water supplied to Owens Valley uses will remain in effect until further order of the court.
 

 Regan, J., and Evans, J., concurred.
 

 A petition for a rehearing was denied July 25, 1977, and the opinion was modified to read as printed above. Respondents.’ petition for a hearing by the Supreme Court was denied October 6, 1977. Richardson, J., did not participate therein.
 

 [1]
 

 The guidelines issued by the State Office of Planning call for a final EIR, which shall include a section of comments from others and the agency’s response to significant environmental comments. (Cal.Admin.Code, tit. 14, § 15146.) The final EIR before us consists of three volumes: (1) A summary of the EIR and categorical responses; (2) the revised draft EIR and the technical supplement; (3) an appendix containing individual responses to comments submitted by a citizens’ advisory committee, copies of all comments received, and additional background material.
 

 [2]
 

 The California Environmental Quality Act appears in Public Resources Code section 21000 et seq. All our statutory citations will refer to the Public Resources Code unless otherwise specified.
 

 [3]
 

 Here the report states: “The objective of the project is to develop a water source that can supplement surface flow during years of normal and below normal runoff to supply the uses of water on City of Los Angeles lands that have developed but were not planned for when the Second Los Angeles Aqueduct was authorized and constructed.” (Final EIR, vol. I, p. B-l.)
 

 [4]
 

 “The project being recommended by the staff in this Final EIR is to operate the Los Angeles Aqueduct System in an environmentally sensitive manner to benefit the citizens of Los Angeles and the people of Inyo County. Water supplies for local uses on City lands is [sic] being made possible with a locally derived water source, i.e., increased pumping of the Owens Valley Groundwater Basin.”
 
 (Id.)
 

 [5]
 

 The report declares: “The operation of the Aqueduct System with the recommended project is the basis of the impact statements.”
 
 (Id,
 
 vol. I, p. B-5.)
 

 [6]
 

 We quote the essential features of the proposed project as described in the approval resolution of the Board of Water and Power Commissioners:
 

 “1. The construction of no new production wells, i.e., no increase in present well capacity.
 

 “2. Continuance of existing capacity through normal and routine maintenance activities including well deepening and construction of replacements for damaged or inoperable wells.
 

 “3. Long-term pumping average of 140 cfs. and maximum annual average of pumping of 315 cfs in dry years. “4. Dry year operation guidelines that call for equal reductions of water export and irrigation supplies.
 

 “5. Increased export during wet years and conjunctive operations of the Los Angeles Aqueduct System with the San Fernando Valley Groundwater Basin.
 

 “6. Constructing a pipeline in the San Fernando Valley to permit storage of Owens Valley water in the underground during wet years for subsequent extraction during dry years.
 

 “7. Water conservation program within the City of Los Angeles.
 

 “8. Constructing a concrete lined canal to collect pumped groundwater in the Laws area and concrete lining the middle reach of the Big Pine Canal.
 

 “9. A change in the pumping pattern with a smaller percentage of average pumping taking place in the Independence area.
 

 “10. Reduction in irrigation usage in the Mono Basin of 2,200 acre-feet and in inefficient stock water practices throughout the Inyo and Mono area that will result in a decrease of approximately 13,600 acre-feet from that shown in the Revised Draft EIR.”
 

 [7]
 

 The City of Los Angeles owns approximately 300,000 acres in Mono and Inyo Counties. In the latter county it supplies domestic water for the towns of Independence, ■ Lone Pine, Big Pine and Laws, stockwater, recreation water and irrigation water for ranchers leasing city-owned lands.
 

 [8]
 

 In the same declaration Mr. Georgeson stated that after authorization of the second aqueduct, additional needs had arisen for use of city water within the Owens Valley. These needs included irrigation of an additional 4,000 acres plus recreational and wildlife enhancement. The increased in-valley utilization was estimated at 48 cfs.
 

 [9]
 

 The distinction is borne out by the CEQA Guidelines, which recognize that the impact statement process covers environmentally related programs as well as tangible construction projects. (See Cal.Admin.Code, tit. 14, § 15068;
 
 Scientists’ Inst. For Pub. Info., Inc.
 
 v.
 
 Atomic Energy Com’n
 
 (D.C.Cir. 1973) 481 F.2d 1079, 1087-1088 [156 App.D.C. 395].)
 

 [10]
 

 At one point of the final EIR the contradiction becomes explicit: “In the process of preparing this environmental impact report, other aspects of Aqueduct System operation have been reevaluated. This includes a reappraisal of the rate of export through the Los Angeles Aqueducts. Thus, the project description presented below includes references to the rate of export, even though the rate of export was not part of the project as defined by the Third District Appellate Court in Inyo v. Yorty (32 C.A.3d 795).” (Final EIR. vol. I, p. B-1)
 

 [11]
 

 At another point, the authors of the EIR complain that in our 1973 decision, “The court did not give clear guidance on the level from which the increase [in groundwater pumping] takes place.” (Final EIR. vol. I, p. C-102.) Despite this alleged lack of clarity, the department of water and power spent three years of EIR preparation without returning to this court for clarification.
 

 [12]
 

 The above formulation views completion of the second aqueduct in 1970 as the time point for calculating the “pre-project” baseline rate of groundwater extraction. An alternate and legally supportable time point is November 1970, when CEQA first became effective. Thus there is a general coincidence of time points for calculating the average pumping rate forming the baseline for the CEQA-subject project. The parties apparently agree that the pre-1970 long-term average rate of groundwater extraction was roughly 10 cfs.
 

 Our reformulation achieves no extremes of invulnerability. It does not qualify the concept of average rate by a time factor. It utilizes the wavering adverb “reasonably” to describe the baseline average. We have the impression that the hydrological engineers have not yet exhibited uncertainties or quarrels over averages.
 

 [13]
 

 In our August 1976 decision we voiced a related concern stating: “At the inception of the proceeding, the city took the position that the lawsuit included the pumping of groundwater for export to Los Angeles via the enlarged Los Angeles Aqueduct system. As the proceedings developed, the city’s position shifted until it arrived at its current position, which is that the increase of groundwater pumping is designed solely and entirely for use within the Owens Valley.”
 
 (County of Inyo
 
 v.
 
 City of Los Angeles, supra,
 
 61 Cal.App.3d at pp. 99-100.)
 

 [11]
 

 Several of the recommendations adopted by the commissioners (see fn. 6,
 
 ante)
 
 would launch environmentally significant activities in the Los Angeles environs. The EIR’s sufficiency as the basis for such proposals is open to question.
 

 [15]
 

 The problem of timing an EIR covering an integrated series of programs was analyzed by the Court of Appeals for the District of Columbia in
 
 Scientists' Inst. For Pub. Info., Inc.
 
 v.
 
 Atomic Energy Com'n., supra.
 
 At one point of its analysis (481 F.2d at pp. 1087-1088) the court quoted approvingly from a policy memorandum of the Council on Environmental Quality; “ ‘Individual actions that are related either geographically or as logical parts in a chain of contemplated actions may be more appropriately evaluated in a single, program statement. Such a statement also appears appropriate in connection with ... the development of a new program that contemplates a number of subsequent actions. . . . [T]he program statement has a number of advantages. It provides an occasion for a more exhaustive consideration of effects and alternatives than would be
 
 *205
 
 practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basic policy questions.