[No. B009200. Second Dist., Div. Two. Jan. 17, 1986.]

LAS VIRGENES HOMEOWNERS FEDERATION, INC., et al.,
Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES, Defendant and Respondent;
CURREY-RIACH COMPANY, Real Party in Interest and Respondent.

302

COUNSEL

Francis & Yardum and G. Greg Aftergood for Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, and Helen S. Parker, Deputy County Counsel, for Defendant and Respondent.

Ross & Scott, William D. Ross and Diana P. Scott for Real Party in Interest and Respondent.

OPINION

COMPTON, J.—This appeal arises out of the challenge by two homeowners associations (Homeowners) to a development project proposed by real party in interest (Developer) and approved by the County of Los Angeles (County).

Homeowners attack the County's approval of the project, contending (1) that the environmental impact report (EIR) for the project does not comply with the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and State Planning and Zoning Law (Gov. Code, § 65000 et seq.); (2) that the approval will result in significant unmitigable adverse effects on the environment and therefore it was a prejudicial abuse of the County's discretion to find that the project will not have a significant effect on the environment; (3) that the scenic highway element of the General Plan is void for lack of implementation; (4) that the Malibu-Santa Monica Mountains Area Plan is inconsistent with the County's General Plan, and the project is inconsistent with both; and finally, (5) that the approved densities within the project purportedly authorized by an amendment to the County's General Plan are not in compliance with State Planning and Zoning Law. (Gov. Code, § 65302, subd. (a).)

The project in question is proposed to be developed on 516.2 acres of land, owned by Developer, in the Las Virgenes Valley in the Santa Monica Mountains, an unincorporated area of Los Angeles County. The land is presently rural. It is immediately adjacent to and south of the Ventura Freeway and west of Las Virgenes Road. The land lies within the boundaries of the Santa Monica Mountains National Recreation Area, and directly borders on Malibu Creek State Park and the Liberty Canyon Natural Preserve. There is existing residential development to the west of the property and considerable projected and existing commercial and industrial development

along the Ventura Freeway. Under the proposed project the lots along the freeway would be developed for light industrial commercial use with approximately one million square feet of office space. Immediately adjacent to these lots would be a 15-acre site dedicated for use as a County Civic Center. The central and easterly portions of the land would be developed with 1,192 residential units, except for an 11-acre neighborhood park and 26 acres of creek bed and flood plain of the Las Virgenes Creek, which flows southward to its confluence with Malibu Creek and eventually to the Pacific Ocean. An 8-acre site has also been reserved for an elementary school. The remaining 215 acres of hilly terrain in the western portion of the project would be retained as open space.

Development of the project required approval by the Los Angeles County Regional Planning Commission of Zone Change No. 81-039, conditional use permit No. 2013 and tentative subdivision tract maps Nos. 32952, 32953, 32954, 32960, 32964, 32988 and 33128. This approval was granted but Homeowners appealed the approval of the conditional use permit No. 2013 to the County board of supervisors. Developer appealed the approval of tentative tract maps Nos. 32952, 32964 and 33128 on technical grounds. The remainder of the tentative tract map approvals was not appealed. (Los Angeles County Code, §§ 22.60.200, 22.60.270, 21.40.160, 21.56.010 B, C.)

Because of the appeals and because Government Code sections 65856 and 65857 require approval of zone changes by the legislative body of the involved local agency, the Los Angeles County Board of Supervisors held hearings on zone change No. 81-039, conditional use permit No. 2013, and tentative subdivision tract maps 32952, 32964, 33128 and approved all of them, adopting the zone change as ordinance No. 83-0062z and attaching 51 conditions to the conditional use permit. The approval also included certification of the final environmental impact report for the project.

Homeowners petitioned the superior court for a writ of mandate and for injunctive and declaratory relief, challenging all seven tentative subdivision tract maps, the conditional use permit No. 2013, the zone change ordinance No. 83-0062z, and the final environmental impact report. Developer and County responded and moved for denial of the peremptory writ of mandate. Following a hearing the trial court rendered judgment for Developer and County, and issued a 16-page statement of decision. Homeowners have appealed. We affirm.

■ Judicial review of quasi-legislative actions, such as enactment of zoning ordinances and adoption or amendment of general plans, is normally

obtained by petition for a writ of ordinary mandamus pursuant to Code of Civil Procedure section 1085; and the scope of review is limited to a determination of whether the agency's action was arbitrary, capricious or entirely lacking in evidentiary support. (*Stauffer Chemical Co.* v. *Air Resources Board* (1982) 128 Cal.App.3d 789, 794 [180 Cal.Rptr. 550]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 674 [188 Cal.Rptr. 233]; Gov. Code, § 65301.5.)

Approvals of the conditional use permit and tentative tract maps were administrative, quasi-judicial acts reviewable pursuant to Code of Civil Procedure section 1094.5 which requires a court to determine whether the administrative agency has abused its discretion. Abuse of discretion is established where the agency has not proceeded in the manner required by law, has made a decision unsupported by the findings, or has made findings unsupported by substantial evidence in light of the whole record. There is no authorization in a case such as this for the court to exercise its independent judgment on the evidence.

Because Homeowner's appeal is based largely upon their contentions that the EIR for the project is fatally deficient in several respects, we will begin our review there.

Sufficiency of an EIR is independently reviewable pursuant to Public Resources Code section 21168.5. (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne, supra,* 138 Cal.App.3d 664, 673; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) This section provides that the inquiry shall extend to whether there was a prejudicial abuse of discretion which is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.

The purpose of an EIR is to inform governmental decision makers and the public of the environmental consequences of a given project so that the political process may be engaged in the analysis and evaluation of the project and a decision may be arrived at intelligently. (Pub. Resources Code, § 21061; Cal. Admin. Code, tit. 14, § 15150; *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 405 [151 Cal.Rptr. 866]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne, supra,* at p. 673.) Our purpose in reviewing the present EIR, therefore, is not to pass upon the correctness of its conclusions, but only upon its sufficiency as an informative document. (*County of Inyo* v. *City of Los Angeles, supra,* at p. 189.)

■ As a means of implementing CEQA, the Legislature ordered the development of guidelines.[1] (Pub. Resources Code, § 21083; former Cal. Admin. Code, tit. 14, § 15000 et seq.)[2] These guidelines require that an EIR discuss, among other things, the cumulative effect upon the environment of the subject project in conjunction with other closely related past, present and reasonably foreseeable probable future projects. (Cal. Admin. Code, tit. 14, §§ 15142, subd. (a), 15143, 15023.5.) The purpose of this requirement is obvious: consideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024 [192 Cal.Rptr. 325].)

According to Homeowners, a table of related projects included in the draft EIR for the subject project fails to disclose the existence of an additional 4,537 residential units nearby and 900,000 square feet of contiguous commercial/industrial development. They also contend that the Developer and County never responded to Homeowner's requests that the EIR analyze these and other nearby projects uncovered by Homeowners. (Cal. Admin. Code, tit. 14, § 15146.)

After reviewing the record we are convinced of the correctness of the trial court's finding on this issue. The project EIR amply analyzed the cumulative impacts of adjacent residential, commercial and industrial development upon, among other things, traffic, schools and sewage treatment facilities.

---

[1] Homeowners urge us to utilize the guidelines as standards of review. However, the guidelines are not strict standards but rather "are indications or outlines to be followed, allowing for flexibility of action and conduct of governmental agencies faced with what are frequently complex and difficult decisions which could affect the environment. They are distinguishable from standards which frequently require a rigid and precise application according to legislative intent. The guidelines themselves make this clear. . . . The guidelines have only general application to the diversity of projects undertaken or approved by public agencies. . . . Even where specific guidelines have been urged upon the courts as requiring a narrow and restricted approach by the governmental agency, the courts have followed the general tenor of the guidelines, indicating that they are subject to a construction of reasonableness and the court will not seek to impose unreasonable extremes or to inject itself within the area of discretion as to the choice of action to be taken. (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 286, 287 [152 Cal.Rptr. 585].)" (*Karlson* v. *City of Camarillo, supra,* 100 Cal.App.3d 789, 804-805.)

[2] All references to guidelines herein are to those as they existed prior to their revision in July 1980. They have since been rearranged and renumbered.

Furthermore, in addition to the discussion in the project EIR, County and Developer relied upon the concept of "tiering" of EIRs. (Cal. Admin. Code, tit. 14, §§ 15041, 15069.7.) Agencies are encouraged by the guidelines to tier their EIRs to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. (Cal. Admin. Code, tit. 14, §§ 15068.5, 15069.7, subd. (a).) Whenever a broad scope EIR has been prepared for a program, plan or policy and an environmental document is prepared later for an action included within the program, plan or policy (such as a site specific action) the subsequent environmental document need only summarize the issues discussed in the broad scope or program EIR, incorporate discussions from the broader EIR by reference, and concentrate on the specific action proposed. (Pub. Resources Code, § 21003, subd. (e); Cal. Admin. Code, tit. 14, §§ 15069.7, subd. (b), 15068.5.) Therefore the question is simply whether the County and the public were in possession of sufficient information, from all of the plans and EIRs available, about the cumulative impact of the aggregate developments proposed for the area in which the subject project is located.

The project EIR and the findings for conditional use permit No. 2013 and the tentative tract map approvals refer to the EIRs of the Malibu/Santa Monica Mountains Area Plan (MSMMAP) and the Los Angeles County General Plan (General Plan).[3] The MSMMAP EIR assumes a "worst case" scenario of buildout densities when evaluating environmental impact of development as planned and mapped out in the development policy maps.[4]

The County, in adopting its General Plan and the MSMMAP, necessarily addressed the cumulative impacts of buildout to the maximum possible densities allowed by those plans. In addition, as required, mitigation measures were proposed and any overriding benefits of development were noted. It was not necessary for the project EIR to recover this ground.

Homeowners also contend that the project EIR is deficient because it fails to consider reasonable mitigation measures and alternatives to the devel-

[3]In addition to the voluminous administrative and superior court record designated by the parties we have taken judicial notice of the Los Angeles County General Plan which all parties have repeatedly cited in their briefs. (Evid. Code, §§ 452, subd. (h) and 459, subd. (a).)

[4]Development policy maps are graphic visual depictions of planned development policies and are attached to the County's General Plan and to the MSMMAP. These maps are based on the statements of general policy, the plan projections, and the city and unincorporated community plans. Their function is to amplify plan policy by indicating the geographic or spatial aspects of policy, which cannot be adequately expressed in written statements or in the projections.

opment project as required by CEQA and the guidelines. (Pub. Resources Code, § 21100, subds. (c) and (d); Cal. Admin. Code, tit. 14, § 15143, subds. (c) and (d).) In fact, the project EIR does contain three alternatives to the project: (1) a no project alternative, (2) a reduced density alternative, and (3) incorporation of the site into the Santa Monica Mountains National Recreation Area. The EIR discusses the impact upon the natural and man-made environment of each of these alternatives and considers mitigation measures. No reasonable interpretation of the guidelines requires more.

The EIR supplied reasons for rejecting the alternatives discussed, specifically that some of the alternatives would have entailed significant adverse effects themselves, would have been out of line with state and local policies of providing needed housing and economic opportunities, or would have been economically infeasible. The discussion of the "no project" alternative and the reasons for its rejection also suffices to fulfill any requirement for a determination of why the proposed project is justified now, rather than reservation of an option for further alternatives. (Cal. Admin. Code, tit. 14, § 15143, subd. (c).) This requirement is also fulfilled by the MSMMAP EIR, which states that within the Ventura Freeway Corridor long-term productivity is synonymous with urban development to provide homes, jobs and services for population growth.

Considered together, as they should be, the project EIR and the MSMMAP EIR thoroughly discuss and clarify policy for planned urban growth along the Ventura Freeway and for conservation of open space nearby. The proposed project not only commits land near the freeway appropriately to urban development but also, as the trial court found, insures a commitment to the reservation of a significant amount of open space and is therefore consistent with the goals and policies of the County's General Plan concerning that area.

In addition, and contrary to Homeowners' contention, the project EIR does discuss at length numerous mitigation measures for the subject project itself, as required by Public Resources Code section 21100 and California Administrative Code, title 14, section 15143. As a result of the review by, and input from, numerous County, state and federal agencies and special districts and the public, numerous findings were made and over 50 conditions were imposed with the granting of the conditional use permit. These conditions included reduction of the number of residential units from 1,540 to 1,192, reduction and phasing of grading, reduction of building height

limits, concentration of residential development in more level portions of the site, use of design, landscaping and contouring to reduce adverse visual impact, and retention of more than 50 percent of the site as open space. In addition the recognition of the duty to avoid or mitigate the adverse impacts of the subject project caused Developer to incorporate into the design of the project many measures to specifically reduce the effects. (Cal. Admin. Code, tit. 14, § 15088.) Overall, the mitigation measures imposed exceed those required by law.

Also contrary to Homeowners' assertion, the final EIR adequately responded to public comments on the perceived inadequacies of the project and the draft EIR, including the comment urging greater consideration of the cumulative impacts of nearby projects.

Homeowners' vague assertion that the EIR fails to adequately describe the environmental setting of the subject project, as required by guideline section 15142, is unsupported by the record. In fact, the project EIR contains specific descriptions of the precise location of the project and the characteristics of the site, including such categories as biota, archeological resources, paleontological resources, scenic quality, traffic and vehicular access, sewage treatment, educational facilities, fire protection services, sheriff services, and parks and recreation.

Homeowners contend that the project EIR is fatally deficient for failure to include a statement of overriding considerations, which is required by the guidelines when "the decision of the public agency allows the occurrence of significant effects which are identified in the final EIR but are not mitigated." (Cal. Admin. Code, tit. 14, § 15089, subd. (b).) We are of the opinion that no statement of overriding considerations was required. All of the significant effects identified in the final EIR for the project are mitigated to some degree. There is no requirement that adverse impacts of a project be avoided completely or reduced to a level of insignificance, as Homeowners imply, if such would render the project unfeasible. Homeowners have adopted this unattainably strict standard of "reduction to insignificance" from a section of the guidelines that requires discussion of measures to mitigate to insignificant levels any adverse impacts that are *completely avoidable.* (Cal. Admin. Code, tit. 14, § 15143, subd. (c).) By contrast, the guidelines also recognize a category of significant environmental effects *which cannot be avoided* wholly if the project is implemented (Cal. Admin. Code, tit. 14, § 15143, subd. (b)), and it is into this latter category that many of the impacts of these projects fall.

We conclude that the certification of the project EIR is supported by substantial evidence and fully complied with the requirements of CEQA.

Homeowners challenge the approval of the zone change ordinance, the conditional use permit and tentative Tract Map 32988 on the basis of alleged inconsistency with the County's General Plan Land Use Policy Map. They contend that the 35-acre parcel south of the A.E. Wright School, adjacent to Las Virgenes Road (parcel 24), was designated on the General Plan Land Use Policy Map as nonurban. The nonurban designation, according to the General Plan, calls for less than one dwelling unit per acre. The present project as approved shows development of parcel 24 at 15 units per acre.

County and Developer defend this apparent inconsistency by pointing out that the MSMMAP Development Policy Map zones parcel 24 as residential, with two to four dwelling units per acre allowed. This is an urban designation, rather than a rural or nonurban designation.

Homeowners object that the MSMMAP designation of parcel 24 as urban/residential is inconsistent with the General Plan designation of the parcel as nonurban/rural. But the General Plan for the County states repeatedly that policy maps are general in character and are not to be interpreted literally or precisely. (General Plan, pp. 9, 13, 14, I-47, III-37.) Due to the scale of the General Plan policy maps, use patterns of less than 50 acres are not shown. (General Plan, pp. I-47, III-21.)

The General Plan consists of two major components: (1) countywide chapters and elements which set countywide policy framework, and (2) areawide and community plans which deal with local issues of unincorporated communities. The areawide plans, such as the MSMMAP, are extensions or refinements of County-wide policy. (General Plan, pp. 4, III-29.) The General Plan Land Use Policy Map identifies general and dominant uses and intensities. The role of the local plan is to identify more specific land uses, determine actual boundaries between land use categories, and establish more specific residential density ranges within the general parameters established by the countywide goals and policies. (General Plan, p. 9.) Because it is necessary to judge proposals in relation to stated policies of the General Plan in addition to the policy map itself, a proposal may be consistent even if not literally supported by the map. (General Plan, p. I-56.) The mere examination of land use and other policy maps is insufficient to determine consistency. (General Plan, p. VIII-2.)

Homeowners insist that approval of a density of 15-units per acre for parcel 24 is still inconsistent with the much lower density of two to four units per acre shown for that parcel on the MSMMAP land use policy map. However this result is consistent with General Plan and MSMMAP land use policies that allow for the clustering of development in the most appropriate building locations. Other residential parcels in the project were zoned for higher dwelling unit densities. The MSMMAP provides that "[r]esidential density shall be based on an average for the project." (MSMMAP, p. 33, § 33.7.) The maximum allowable residential density project-wide is 1250. The total approved number of units is 1192, only 110 of which will be built in the hilly rural area of the project.

The MSMMAP and the General Plan policies call for clustering of housing on areas most suitable for building vis-à-vis levelness of terrain, proximity to other development, maximization of open space and minimization of adverse impacts. The project is consistent with this policy in that it clusters the allowable residential development for the whole project on level, easily accessible land and minimizes the spreading out of the residential development into the hilly terrain to the west of Las Virgenes Creek, which was originally zoned for low density residential development, but which will now remain open space. This is also consistent with the MSMMAP policy that prohibits transference of urban residential densities allocated to a project from an urban to a rural mapped area.

Homeowners argue that the County's adoption of subplan amendment 023-82, which allows some transfers of units within a project regardless of urban or nonurban designation, renders the County's General Plan to be in noncompliance with state planning and zoning law. (Gov. Code, § 65302.) However, substantial evidence supports the finding that there was no such transfer of units with the subject project pursuant the subplan amendment 023-82. Rather, as discussed above, all transfers of residential units within the project were to areas properly zoned urban and residential, such as parcel 24, and were accomplished pursuant to the land use policies stated in the General Plan and in the MSMMAP. Therefore, the alleged noncompliance of subplan amendment 023-82 is irrelevant to a determination of the validity of the approval of this project.

The reference by the General Plan to the more specific areawide plans does not constitute an impermissible "precedence clause." The General Plan was designed to include the more specific areawide plans as component parts. The trial court's conclusion, that there is but one general plan

of which the MSMMAP is a consistent and necessary component, is correct. The areawide plan serves to complete, extend and refine the General Plan land use policy, not contradict it. We therefore find no inconsistency between the project land use densities and the MSMMAP, or between the MSMMAP and the County General Plan.

Homeowners contend that the County has failed to implement the scenic highway element of the General Plan adopted pursuant to former Government Code section 65402, subdivision (h). Such failure, they assert, voids the scenic highways element and renders the General Plan in noncompliance with the state law. We disagree. Streets and Highways Code sections 260 and 261 require local governments to protect the land adjacent to highway rights-of-way through, among other things, regulation of land use and density, land and site planning, control of outdoor advertising, control of earth movement and landscaping and design and appearance of structures and equipment. (Sts. & Hy. Code, §§ 260 and 261.) All of these requirements are addressed, point for point, by the scenic highway element of the County's General Plan. The County's extensive review of the subject project resulted in the implementation of numerous measures to mitigate scenic impacts along the Ventura Freeway in accordance with the scenic highway element policies and the Streets and Highways Code. Some of those measures are: redesign of buildings and reduction of building height; limitation on building-to-lot coverage to 40 percent; landscaping; screening and berm-building; billboard prohibition; undergrounding of utility lines; reduction in grading; maintenance of 214 acres as open space; clustering of residences on level areas away from hills and ridge lines. We therefore agree with the trial court that the scenic highway element, as adopted by the County of Los Angeles, is in full conformance with applicable provisions of law including former Government Code section 65302, subdivision (h), Streets and Highways Code section 261 and the General Plan guidelines dealing with the content of the scenic highway element as adopted by the State Office of Planning and Research pursuant to Government Code section 65040.2. Further, this Element is internally consistent with other provisions of the County General Plan and the MSMMAP. There is no evidence that would support a conclusion that the County General Plan Scenic Highway Element was adopted in an arbitrary or capricious manner, that its adoption was without substantial justification, or that in adopting zone change No. 81-039 the respondents did not follow applicable procedures, give the notices required by law or comply with the requirements of the General Plan Scenic Highway Element. (Code Civ. Proc., § 1085.)

 In conclusion we find that the County's approvals of the entitlements to use in this case are supported by substantial evidence, were not

arbitrary or capricious, and did not constitute an abuse of discretion.

The judgment is affirmed.

Roth, P. J., and Gates, J., concurred.

A petition for a rehearing was denied February 11, 1986, and appellants' petition for review by the Supreme Court was denied May 8, 1986. Reynoso, J., was of the opinion that the petition should be granted.