[Civ. No. 67879. Second Dist., Div. Two. Nov. 16, 1983.]

CITY OF LOMITA et al., Plaintiffs and Appellants, v.
CITY OF TORRANCE et al., Defendants and Respondents.

**COUNSEL**

Leland C. Dolley, City Attorney, Burke, Williams & Sorensen and Douglas G. Carroll for Plaintiffs and Appellants.

Stanley E. Remelmeyer, City Attorney, and Stuart B. Scudder for Defendants and Respondents.

**OPINION**

**ROTH, P. J.**—Respondent City of Torrance (Torrance) owns and operates a municipal airport, the eastern border of which is located at the boundary of Torrance and the City of Lomita (Lomita). Having earlier perceived a need for a master plan relating to the airport's development, Torrance in 1972 began actively to consider what the plan should be and in December of 1973 obtained from a firm engaged in the preparation of such documents a master plan and an accompanying environmental impact report (EIR). When the latter was determined to be inadequate following public hearings thereon, and in February of 1976, Torrance obtained from a different source

a second EIR based on the master plan, and then a third upon the second's similar rejection. After concluding the third EIR likewise did not meet its requirements, Torrance in April of 1976 prepared its own EIR which following other public hearings was recommended for approval by the Torrance City Council. That recommendation in turn was aired at further public hearings before the council and in August of 1976 a final EIR was approved by that body. Lomita actively participated in all the foregoing hearings and was otherwise involved in the process described.

Beginning in April of 1977, Torrance undertook to modify the master plan in certain respects and to this end conducted at least four additional public hearings in which Lomita also actively participated.

In January of 1978, Torrance formally notified the State Secretary for Resources and the Los Angeles County Clerk of its adoption of the master plan as modified. No new EIR was prepared in respect of the modifications.

On January 31, 1978, Lomita filed its complaint for declaratory relief and writ of mandamus seeking to set aside Torrance's approval of the EIR and to foreclose implementation of the modified master plan. This appeal followed a judgment dated October 6, 1981, denying the requested relief. We affirm.

As the basis for its decision the trial court herein made the following findings of fact.

"1. That in 1972 the City of Torrance determined that it should prepare a new planning document for the Torrance Municipal Airport.

"2. During the following two years, between June 1972 and the end of 1974, there were informal consultations between the staff of the City of Torrance and of the City of Lomita. The consultations were sparse, but they did exist. In December of 1976, the Torrance Airport Manager went to City Hall of Lomita and met with the city manager of the City of Lomita in his office. The airport manager left with the city manager the environmental documents and invited further consultation by the City of Lomita.

"3. Several draft EIR's were prepared by the City of Torrance in the environmental review process. The environmental review process was conducted parallel in time with development of the drafts of the Airport Master Plan. Proper public notice was given by the City of Torrance of the ongoing process and extensive public hearings were held.

"4. The City of Lomita, through its City Attorney and City Council Members, as well as citizens of the City of Lomita, participated actively in

several public hearings in the City of Torrance relating to the EIR and the master plan. The City of Lomita, through its officials and its inhabitants, contributed extensive commentary, both orally and in writing, to the development of the airport EIR and master plan.

"5. The Torrance EIR review and approval process is two staged. The stage one hearings are before a staff board called the Environmental Review Board. In this case, the Environmental Review Board held hearings on two draft EIR's. This process consumed several months. The second draft EIR was prepared by City of Torrance staff, but only after severe criticism of the previous EIR's by the City of Lomita and other members of the public at the Environmental Review Board Meetings. Finally, the Environmental Review Board recommended a draft EIR for approval and it was subject to the public review. The decision of the Environmental Review Board was appealed by the City of Lomita to the City Council of the City of Torrance. In the course of this appeal, the City of Lomita made several additional comments in writing adverse to the EIR in a letter dated April 21, 1976.

"6. These comments by the City of Lomita were considered and responded to in writing by the City of Torrance. . . . Torrance City Council approved the draft EIR with the addition of comments and responses to be the final EIR.

"7. The final EIR was prepared, but through a clerical error, the comments by the City of Lomita on the EIR at the appeal hearing were omitted. [T]he noninclusion . . . was not a critical error.

"8. The preparation of the Final Airport Master Plan continued for over a year after the 1976 finalizing of the EIR. During that period of time the master plan was changed, but these changes were essentially noise mitigation measures. . . .

"9. The Torrance Municipal Airport Master Plan, during its further development in 1977, was subjected to several public hearings before the City Council. Here again, the City of Lomita sent representatives and gave input into the content of the master plan. During this process, the ambitious plans for the expansion of aircraft operations were scaled down considerably in response to criticism by the City of Lomita, among others. Thus, certain changes were made from the draft plan in existence at the time of final EIR approval. . . . The various changes in plans were not significant in this context and were within the scope of the final EIR in a general way.

"10. On December 6, 1977, City Council adopted the final EIR, certified to its review, and also adopted the Airport Master Plan. Findings were made

by the City Council and actions were taken in the body of the master plan to mitigate any adverse effects of the master plan."

The trial court similarly made its conclusions of law to the effect that,

"2. That by reason of the foregoing, the final EIR identified the significant effects of the Airport Master Plan, itself a planning document; the Final EIR and Final Master Plan reduced these effects to an acceptable level; and the City of Torrance balanced the benefits of the planned changes in the airport property against its unavoidable risks. The final Master Plan as approved, provides for mitigation of the identified environmental risks. Thus, [14 Cal. Admin. Code], §§ 15088 and 15089[1] were satisfied.

"3. [Torrance] proceeded in the manner prescribed by law and its determination is supported by substantial evidence in the record.

". . . . . . . . . . . . . . . . . . . .

"6. No subsequent environmental impact report is required to address the changes in the revised 1977 master plan from the earlier master plan since there are no significant damages to the environment or adverse environmental impacts not discussed in the final EIR.

---

[1]The sections, which together with others are in aid of the California Environmental Quality Act of 1970 ("CEQA") (Pub. Resources Code §§ 21000 et seq.) provide respectively that,

"(a) The lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response. The lead agency shall respond to comments received during the noticed comment period and any extensions and may respond to late comments.

"(b) The written response shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular, the major environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice.

"(c) The response to comments may take the form of a revision to the draft EIR or may be a separate section in the final EIR. Where the response to comments makes important changes in the information contained in the text of the draft EIR, the lead agency should either:

"(1) Revise the text in the body of the EIR, or

"(2) Include marginal notes showing that the information is revised in the response to comments." (Cal. Admin. Code, tit. 14, § 15088.)

"(a) The lead agency shall prepare a final EIR before approving the project. The contents of a final EIR are specified in Section 15132 of these guidelines.

"(b) Lead agencies may provide an opportunity for review of the final EIR by the public or by commenting agencies before approving the project. The review of a final EIR should focus on the responses to comments on the draft EIR." (Cal. Admin. Code, tit. 14, § 15089.)

"■. . . . . . . . . . . . . . . . . . . . . . . .

"8. The record before the Court shows that [Lomita's] concerns were addressed and responded to before the decision making body, but were omitted from the Final EIR document through clerical error."

■ In support of its claim the trial court's findings were unsupported by the evidence and that its conclusions and ultimate judgment therefor cannot be sustained, Lomita specifically contends,

1. The EIR relied upon was not related to the master plan as modified and thus is inadequate as a matter of law.

■ 2. The EIR, even if concluded to be sufficiently related to the master plan as modified, is otherwise deficient.

■ 3. The EIR was in all events adopted improperly in that it was prepared without meaningful consultation with Lomita and without a specific finding by the Torrance City Council that it was "completed in compliance with CEQA (see footnote 1) and the state guidelines," as required by California Administrative Code, title 14, § 15085, subdivision (g).

While thus stating its case, it is also accepted by Lomita that the standard for judicial review in this instance is that, "In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see also *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401].)

It is similarly without dispute that "An EIR should be prepared with a sufficient degree of analysis to provide decision makers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Cal. Admin. Code, tit. 14, § 15150.)

■ Finally, " 'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.' (*McCosker* v. *McCosker* (1954) 122 Cal.App.2d 498, 500.) It is neither practical nor appropriate for [a reviewing court] to comb the record on [an appellant's] behalf." (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888 [160 Cal.Rptr. 516, 603 P.2d 881].)

Based on these principles, we are of the view Lomita has failed to establish entitlement to the relief requested.

■ So it is urged in respect of Lomita's first contention the trial court's finding that changes made in the master plan after preparation of the EIR were not significant and were within the scope of the EIR that "one need only give a cursory look (at the plans) to see that there were many distinct changes" requiring a new EIR.[2]

Nothing is shown, however, nor is any adequate reference to the record otherwise made, to demonstrate the changes alluded to were substantial in comparative terms or that to the extent they were they would require major revisions of the EIR. (See Pub. Resources Code, § 21166.) Neither is there present any specification of what is referred to in Lomita's bare assertion that, "The evidence clearly supports (Lomita's) contention that the final EIR does not meet the requirements of CEQA."

■ Similarly concerning Lomita's second contention, that the EIR is deficient because "it does not contain sufficient discussion of a number of topics required by CEQA," we are told there were alternatives to the master plan which were not considered;[3] we are not told how such alternatives

---

[2]According to appellant,

"1) the navigational aids project was changed;

"2) the City of Lomita was excluded from the Airport Overlay Zone;

"3) the proposed runway widening was changed;

"4) the proposed runway lengthening was changed;

"5) the mid-field exit taxi-way was changed;

"6) the mid-field crash-rescue facility was changed;

"7) the comprehensive service road was changed;

"8) the aircraft washrack facilities were expanded; and

"9) the number of possible fuel pits was expanded."

[3]Those cited by appellant include relocation of the airport to another area, acquiring additional property around the airport to reduce adverse effects, retaining the area of the airport which was devoted to agriculture for that use, closing the airport on weekends, closure or limitations on the use of one or more runways, and closing the airport at certain times of the day.

were "reasonable" or why they "could feasibly attain the basic objectives of the project." (Cal. Admin. Code, tit. 14, § 15143, subd. (d).) We are told mitigation measures relative to the master plan were not properly identified nor adequately analyzed; we are not told in what fashion or to what extent this is true, nor is any specific reference made to what *was* included on this point so as to demonstrate its inadequacy. (Cal. Admin. Code, tit. 14, § 15143, subd. (c).) We are told the EIR ignored the growth-inducing impact of the project even though it called for implementation of "restrictions incorporated in the master plan to prevent the annual level of operations from rising substantially above the 500,000 optimum," because the revised master plan "included no way of actually limiting the number of operations"; we are not advised of the effect of a Torrance City Council resolution made part of that master plan which contained methods for such limitation, nor why a concededly specified limitation of aircraft parking spaces would not provide the desired result. (Cal. Admin. Code, tit. 14, § 15143, subd. (g).) Lastly, we are provided with an extensive list of "environmental issues raised during the public review process" to which it is claimed Torrance did not adequately respond in the EIR, without explanation of why the responses were deficient, or analysis, in some instances, of why the issues were significant. (Cal. Admin. Code, tit. 14, §§ 15146, subd. (a)(4); 15146, subd. (b).)

 Finally, it is maintained the EIR was improperly adopted because its preparation did not include meaningful consultation with Lomita and because required findings respecting it were not made by Torrance. On the first of these points, it is enough to say the claim again is made without reference to evidence on the question in the record and is framed entirely in conclusionary terms. On the second, it is the case that "The final EIR shall be presented to the decision-making body of the Lead Agency. The Lead Agency shall certify that the final EIR has been completed in compliance with CEQA and the state guidelines and that the decision-making body or administrative official having final approval authority over the project has reviewed and considered the information contained in the EIR prior to the approval of the project." (Cal. Admin. Code, tit. 14, § 15085, subd. (g)); and that "[N]o public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings: [¶] (a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report." (Pub. Resources Code, § 21081.)

The Torrance City Council, in an effort to comply with these directions passed its resolution which provided that "1. The City Council has reviewed

and considered the Environmental Impact Report prior to making a decision on the master plan and has made the following findings and determinations in regard thereto:

"(a) The Environmental Impact Report has made known to the City Council and all other affected persons all known possible environmental consequences of the master plan, along with alternatives thereto and mitigation measures therefor, and the same have been reviewed and considered by the City Council.

"(b) That the suggested adverse environmental effects of the plan raised in the Environmental Impact Report, in the comments to the Environmental Impact Report, in the revisions to the Environmental Impact Report and comments thereto, mainly are found either not to exist, to be of short-term duration or able to be mitigated as indicated in the report.

"(c) That even though there may be some environmental consequences of the plan which cannot be completely eliminated, the public interest generally would best be served by adoption of the plan as a matter of overriding public interest, which outweighs any unmitigated impacts which may be generated thereby." In our view, no more was required.

The judgment appealed from is affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied December 7, 1983.