[No. G005607. Fourth Dist., Div. Three. Oct. 11, 1988.]

FUND FOR ENVIRONMENTAL DEFENSE et al., Plaintiffs and Appellants, v.
COUNTY OF ORANGE et al., Defendants and Respondents;
NICHOLS INSTITUTE REFERENCE LABORATORIES, Real Party in Interest and Respondent.

**COUNSEL**

Shute, Mihaly & Weinberger and Rachel B. Hooper for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, and Susan L. Goodkin, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Adrian Kuyper, County Counsel, and Stefan H. Weiss, Deputy County Counsel, for Defendants and Respondents.

Rutan & Tucker and Robert S. Bower for Real Party in Interest and Respondent.

OPINION

**SCOVILLE, P. J.**—Appellants, Fund for Environmental Defense and Charlotte Clarke (referred to collectively as Fund), challenge the Orange County Board of Supervisors' (Board) December 1986 decision to issue a use permit to real party in interest Nichols Institute Reference Laboratories (Nichols) for development of a medical research and laboratory complex on property surrounded by Caspers Wilderness Park.

Nichols originally applied for a use permit on this property in 1980. In October 1981 the Board certified Final EIR 234 (addended) covering the proposed development and an amendment of the County General Plan to allow for a new zoning category applicable to the Nichols project.[1] Based on EIR 234, Nichols' use permit application was approved in 1981. In July 1983 the Orange County Zoning Code was amended to add the "Research/Open Space Park District" category and in September 1983 the Nichols site was rezoned under this new designation.

The Nichols site consists of approximately 100 acres located some 9 miles northeast of the City of San Juan Capistrano. The site is bordered on the north by the Ortega Highway (State Route 74) and on the southwest by the Lucas Canyon haul road leading to the Ortega Rock Company quarry.[2] In 1981, Caspers Wilderness Park, consisting of some 5,473 acres, was located next to the Nichols site, across the Ortega Highway to the north and west of the property. The largest part of the Nichols site was, in 1981, bordered by land owned by Rancho Mission Viejo Company and used primarily for livestock grazing.

Between 1981 and 1983 Rancho Mission Viejo Company sought county approval of its Rancho Santa Margarita project. As a condition of that approval, the company dedicated more than 2,000 acres of land to the county, the land surrounding three sides of the Nichols site on the east side of Ortega Highway. In 1985 this land was added to Caspers Wilderness Park, increasing the park's size to approximately 7,600 acres. As a result, the Nichols site was transformed from property adjacent to the park to an "inholding" completely surrounded by the park.

---

[1] An "R" (Reserve) designation was removed from the Nichols site and it was rezoned "Research/Open Space Park." That designation is described in Component II, Advance Planning Program, Land Use Element of the Orange County General Plan, as: ". . . less intensive employment uses in conjunction with large open space areas . . . as Research/Open Space Parks. Employment facilities on large building sites . . . permitted when they are consistent with the open space character of the area."

[2] In 1981 truck traffic on the Lucas Canyon haul road was approximately eight trips a day.

In the meantime, Nichols allowed its 1981 use permit to expire. It filed a new application in 1986. The Planning Commission approved the new use permit without requiring preparation of a subsequent or supplemental EIR. The commission relied on EIR 234 and a lengthy addendum to the EIR prepared in connection with submission of the 1986 conditional use permit application.

The decision of the commission was appealed to the Board and, on December 17, 1986, a public hearing was held on the matter. The Board denied the appeal and filed a notice of determination pursuant to Public Resources Code section 21152[3] on December 17, 1986.

On January 15, 1987, Fund filed a petition for writ of mandate and complaint for injunctive relief claiming: (1) preparation of a subsequent or supplemental EIR pursuant to section 21166 was required in connection with the county's approval of Nichols's 1986 conditional use permit application; (2) the county's findings certifying the EIR and addendum were legally inadequate, and (3) the county's approval of the use permit was invalid because the project is inconsistent with its general plan.

The trial court denied the petition for writ of mandate. No request for a statement of decision was made. In its minute order the trial court stated: "The court finds that the County did not abuse its discretion in concluding that these conditions [i.e., substantial changes requiring major revisions in the EIR] did not exist and that no subsequent EIR with its renewed public review process (as opposed to merely an addendum to the EIR, without renewed public review) was required. The court finds that the County proceeded in accordance with law, and that the record contains substantial evidence to support the decision reached."

I

*Standard of Review*

The question whether a subsequent or supplemental EIR is required with respect to a proposed project is governed by section 21166 which provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions

---

[3] All statutory references are to the Public Resources Code unless otherwise indicated.

of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."[4]

■ An EIR is required in the first instance whenever a project "may have a significant effect on the environment." (§ 21151.) On the other hand, a subsequent or supplemental EIR is prepared under section 21166 only where it is necessary to explore the environmental ramifications of a substantial change not considered in the original EIR. (Cal. Code Regs., tit. 14, § 15162, subds. (a)(1) & (2); *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 265 [232 Cal.Rptr. 772].) As was said in *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 at pp. 1073-1074 [230 Cal.Rptr. 413], "[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process. Thus, while section 21151 is intended to create a 'low threshold requirement for preparation of an EIR' [citation], [section 21166] indicates a quite different intent, namely, to restrict the powers of agencies 'by prohibiting [them] from requiring a subsequent or supplemental environmental impact report' unless the stated conditions are met. [Citation.]" (Original italics.)

■ In deciding whether a public agency properly determined a subsequent or supplemental EIR was unnecessary, the standard of review is "whether the record as a whole contains substantial evidence to support a determination that the changes in the project [or its circumstances] were not so 'substantial' as to require 'major' modifications to the EIR." (Fn. omitted.) (*Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at p. 1075; § 21168.)[5]

---

[4] State CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) supplement and explain the applicable Public Resources Code sections. Section 15162, subdivisions (a)(1) & (2) of the guidelines provide, as pertinent here, that a subsequent EIR is not required unless the changes in the project and/or the changes with respect to the circumstances of the project are such that they "will require important revisions in the previous EIR . . . due to the involvement of *new significant environmental impacts not covered in a previous EIR. . . .*" (Italics added.)

[5] Section 21168 provides: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section

Our task on this appeal is the same as the trial court's. We too must search the administrative record and determine, in light of the whole record, whether there is substantial evidence supporting the agency's determination, and whether the agency " 'abused its discretion by failing to proceed in the manner required by law.' [Citation.]" (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d 249, 260, fn. omitted; *Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at p. 1076.)

It is also important to emphasize that it is not our task to judge the wisdom of the Board's action in allowing development of the Nichols project in the middle of Caspers Wilderness Park. (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 259; *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 305 [223 Cal.Rptr. 18]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) Our task is simply to determine whether the Board followed proper procedures and whether there is sufficient evidence supporting the Board's determination that no substantial changes were proposed in the Nichols project and no substantial changes occurred with respect to the circumstances under which the project was being undertaken.

## II

### Changes in the Project

#### a. *Increase in Size*

Fund contends the project has substantially increased in size. In its brief Fund states, "The proposed development has increased in size approximately 30%, from 308,000 square feet to 415,000 square feet. While the original proposal was for 22 one-story buildings, the current plan calls for 23 buildings, as many as five of which are two-story. The original proposal provided for 825 parking spaces, some to be located underneath the [building] modules; the current proposal includes 900 spaces. . . ." The record reveals, however, that the increase in square footage is primarily a result of increasing the number of two-story buildings. While square footage has increased, the actual site coverage (the project's "footprint") has only increased from 308,000 to 331,000 square feet, that is, from 7 percent coverage of the site to approximately 7.6 percent coverage.[6] While the number of

---

1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

[6] Under the applicable zoning (Research/Open Space Park) 20 percent site coverage is the maximum allowed. The Nichols project has increased from 7 percent site coverage to 7.6 percent, an increase in site coverage of approximately .6 percent.

two-story buildings has increased, the actual height of the overall project has been lowered. The original proposal called for most of the modules to be built on 10-foot pylons "resulting in overall above-grade structural heights (at any one location) of approximately 28-feet." In addition some modules were to be elevated 30 feet for a maximum above-grade structural height of approximately 48 feet. In the 1986 proposal, buildings are to be constructed at grade rather than on pylons. The 16 one-story modules will have an above-grade structural height of 18 feet and the 7 two-story modules will measure approximately 35 feet in height.

The original proposal included parking "underneath and adjacent to the building modules," not "underground" parking as stated in the brief of amicus curiae. Under the 1986 version, parking lots would all be adjacent to the building. In addition, the number of parking spaces has been increased. However, the maximum number of employees has not been increased, and the nature and amount of work to be done at the site remains the same. There is no increase in traffic impacts, and the project will be phased in over an 11-year period rather than the originally proposed 7-year period.

While Fund sets forth the changes in the project, it fails to demonstrate how these changes require "major revisions" in the original EIR. (*City of Lomita* v. *City of Torrance* (1983) 148 Cal.App.3d 1062, 1069 [196 Cal.Rptr. 538].) In fact, the changes are discussed and analyzed in the addendum.[7] The addendum notes that grading will be increased but concludes this change does not necessitate a change or increase in the mitigation measures already recommended in the original EIR. Thus it is stated in the addendum "Few major landforms onsite will be significantly modified by [grading under] the proposed plan and more than half of the site will be retained in an open space state."

The addendum notes that "[i]mpermeable surfaces" on the site will increase storm runoff by 18.7 percent, whereas the figure under the 1981 version of the project was 11 percent. But mitigation proposed to correct this impact remains the same as that recommended in the original EIR.

b. *New Cluster Pattern of Buildings*

Fund contends the 1986 redesign of the location of the proposed buildings "increases the project's environmental impacts," suggesting that the

[7] Fund argues the fact the addendum is approximately 100 pages long indicates that the changes discussed were substantial. The force of this argument is lost when one realizes that large portions of the addendum were merely copied from EIR 234.

decentralization of the buildings "will result in greater intrusion on views . . . and increased impacts on flora and fauna."

The topography of the site is described in the original EIR as follows: "Erosion . . . has created a system of moderately sloping terraces which descend across the site in a generally westerly trend. . . . Previous grading activity [associated with a 1930 Conservation Corps Camp on the site] has created broad, relatively flat plateau areas in the central and southwestern portions of the site." Because of these already occurring flat plateaus, grading impact on the site has been analyzed to be at a minimum under both versions of the building site plan.

In the 1981 version, most of the buildings were clustered on the central plateau; however, three buildings were located on the northeastern portion of the property and five other buildings were situated to the west and south of the central plateau. Under the 1986 redesign, five buildings are located on the northeast plateau, six are located on the central plateau and the remaining twelve buildings are spread along the western and southwestern plateau. This change required no increase in mitigation requirements. Under either version of the project, grading is restricted to the actual building sites and all other terrain is to be left in its natural state.

The impact of the additional grading on flora and fauna is assessed as negligible in the addendum. The original EIR and the addendum identify the same flora and fauna. Neither document found any involvement of rare or endangered species in connection with the Nichols site. The vegetation most affected by the proposed project (i.e., Rhus-barren, coastal sage scrub, chaparral, and introduced grasslands) is described as "more common and of less aesthetic value." In the EIR and the addendum the conclusion is that "removals" of this type of vegetation "will not have a significant impact on the regional distribution of these vegetation types." Both documents note that, "More than half of the site area will be maintained as open space. The existing oaks and enriched California steppe [grasses] within or near these areas, will be predominantly preserved as part of the open space within the project site. The mosaic of areas which would remain open contain the site's more desirable and valuable vegetation resources, including the native live oaks and a portion of the 'biologically enriched' grassland." The change in distribution of buildings was designed with these constraints in mind and does not impact the "more desirable and valuable biological resources" any more than did the original design.

The impact of the redesign of the building groupings on views into the project from the surrounding park and the highway is explored in the

addendum under the topic heading "Open Space and Aesthetics." In this regard, it should be pointed out that the Nichols site is bounded to the west and south by 50-foot-plus bluffs. In these areas, views into the site are largely blocked by the bluffs and this is the area in which 12 of the buildings have been grouped under the redesigned site plan. The buildings on the northern plateau which are the most visible have been increased by two, and those on the central plateau have been reduced by eight. The conditions imposed for project approval include landscaping which surrounds the buildings in trees. The addendum proposes no new mitigation measures with respect to these changes other than those already suggested in the original EIR. There is no showing these changes necessitated major revisions of the EIR.

c. *Water Supply*

As Fund points out, in the original EIR the proposed water supply for the project was ground water pumped by a new, to-be-drilled well from nearby San Juan Creek. Later tests disclosed this water source would be inadequate, and supply of water to the site was turned over to the Santa Margarita Water District. Fund asserts the 1986 project proposes a different water system calling for a new and uncertain source of water and a 600,000 gallon reservoir tank on the site instead of the originally proposed 350,000 gallon tank.[8]

In fact, the source of water for the project is certain and it is the same source proposed in 1981, to wit: the San Juan Creek basin. In addition, the contemplated water needs of the project are the same as those considered in the original EIR—that is, withdrawal of ground water from the San Juan basin at the rate of 21 acre-feet per year. The original EIR assessed the impact of this withdrawal as follows: "Even during dry periods of the year . . . the relatively small quantities utilized by the proposed project should not substantially affect downstream yields." The addendum concluded the withdrawal of ground water from San Juan basin, the effect on riparian rights and the effect on water quality were the same as assessed in the original EIR despite the changed provider of services. The Santa Margarita Water District prepared negative declarations covering development of a new well and water supply facilities to the Nichols site including the storage tank, and development of a waste water facility. In the negative declarations it was concluded, after completion of an environmental evaluation, that the projects would not have "a significant effect on the environment."

---

[8] From the record it appears the increase in the size of the reservoir tank was, at least in part, necessitated by an increase from 180,000 to 540,000 gallons in the "fireflow requirement."

Fund relies on *City of San Jose* v. *Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005 [237 Cal.Rptr. 845]. That case involved a city's condemnation action to acquire a water company's right to provide water service to a proposed expansion of a redevelopment area. An EIR for the proposed expansion contemplated that Great Oaks Water Company (Great Oaks) would supply water to the new development from its already existing wells. In the condemnation action, Great Oaks objected to the fact no subsequent or supplemental EIR was prepared to consider the environmental effect of the city's substitution of itself for Great Oaks as the provider of water service. The city proposed supplying water from three new wells. Great Oaks put on evidence that the proposed new wells were to be drilled to a depth which would pose a risk of overdraft of the underground water table and were to be located in close proximity to known established underground toxic contamination from industry in the area. The court ruled the city's complete failure to consider whether a subsequent or supplemental EIR or an addendum to the final EIR was necessary constituted a violation of CEQA and that the trial court did not err in dismissing the city's eminent domain action on that ground. (*Id.* at p. 1017.)

The case before us is, of course, distinguishable. Here the county prepared an addendum after deciding that a supplemental or subsequent EIR was not necessary. Its decision was challenged and a public hearing was had on the matter. In addition there is no evidence here of "new significant environmental impacts not considered in a previous EIR" (Cal. Code Regs., tit. 14, § 15162, subd.(a)(1)) as there was in *Great Oaks*.

Fund also relies on *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029], stating, "If the project changes in *Concerned Citizens* were held sufficiently important to require the preparation of a subsequent EIR, *a fortiori* a subsequent EIR is necessary in the instant case." In *Concerned Citizens*, alleged substantial changes had been made in a project for construction of an amphitheater on county fairgrounds in a residential neighborhood after the EIR had been filed. The case concerned whether the objecting citizen group's cause of action was barred by the applicable statute of limitations. Fund relies on dicta in which the court stated, "It cannot be doubted that some of the changes allegedly made in the project . . . could be characterized as substantial enough to require the district to file a subsequent EIR to assess their environmental effects, as required by section 21166, subdivision (a). Certainly, an increase from six to ten acres in the size of the project, a 200 percent increase in seating capacity, and the acoustic effects of moving the stage to face the single-family dwellings north of the fairgrounds were sufficiently important to require consideration of their effects in a later EIR.

[Citation.] The district's failure to address these changes in a subsequent EIR violated section 21166, subdivision (a)." (*Id.* at p. 937.) While this dicta expressed a legitimate concern that projects not be built in total disregard of the proposal explored and analyzed in the EIR, it cannot be regarded as a holding in the legal sense of that word. In any case, the record supports a determination that the project revisions proposed here do not involve the kind of major changes in size, scope and capacity alleged in *Concerned Citizens.*

### III

### *Change in the Circumstances Surrounding the Project*

Fund contends the expansion of Caspers Wilderness Park to completely surround the Nichols project is so substantial a change, that event, standing alone, required the county to prepare a subsequent or supplemental EIR.

Fund's argument is, at first blush, compelling. The bald fact that a project is suddenly surrounded by a wilderness park does sound like a substantial change. However, the record clearly demonstrates the change raises no new adverse effects that were not raised, analyzed and discussed in the original EIR. The effects are all matters of degree. Problems that had already been analyzed and reviewed were expanded or increased by the change in circumstances. But the record supports a finding that the increase in effects was not "cumulatively considerable" (Cal. Code Regs., tit. 14, § 15065, subd.(c)), and hence deserving of a mandatory finding of significant effect. (E.g. *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 364 [212 Cal.Rptr. 127].) No new protected or rare habitat or species of flora or fauna were discovered or found to be impacted that had not been discovered when the EIR was prepared.[9] Even though the land bordering three sides of the site to the northeast and south of the site had changed hands from Rancho Mission Viejo to the county and had changed designation from open agricultural land to part of Caspers Wilderness Park, the land itself did not suddenly spring into a verdant forest. It was precisely the same land as considered in the 1981 EIR, and the Nichols Institute

---

[9] In fact, no protected or rare habitat or species was discovered at the site. Although the addendum discusses for the first time the impact of helicopter flights upon nesting areas of the black-shouldered kite to the north and south of the project, there is no suggestion that the species is endangered or even rare. The mitigation suggested is to change the approach and departure routes of the helicopter to avoid the nesting areas. This is a mitigation suggested in the original EIR to avoid other potential impacts of helicopter flights over Caspers.

project had the same impact on the land whether it was designated open agricultural land or wilderness park.

The fact that the added property will now be open to the public for park purposes was considered in the addendum in terms of impacts on the acoustic environment, viewshed, biological resources, impacts on proposed trails, proposed campsites, etc. However, it was concluded no significant new effects were involved and no substantial revisions to the EIR were required.

Fund's reliance on *Mira Monte Homeowners Assn.* v. *County of Ventura, supra,* 165 Cal.App.3d 357 is misplaced. In *Mira Monte* the proposed project was the subdivision of land into residential lots. The site contained a fragile wetlands area and vernal pool which was the location of rare plant species endemic to the habitat. After the EIR had been prepared and circulated, and only four days prior to the hearing on certification of the EIR and approval of the tentative tract map, the county staff discovered, through a resurvey, a previously undiscovered encroachment, that is, that an additional one-fourth acre of the wetlands was going to be paved over. The court held that the Board abused its discretion in determining that a subsequent or supplemental EIR was not necessary.

But *Mira Monte* is distinguishable from the case before us in two respects. First, *Mira Monte* concerns a change in circumstances surrounding the project which requires a mandatory finding of a significant effect upon the environment under the Guidelines. (Cal. Code Regs., tit. 14, § 15065.) Thus the court stated, "The discovery that 'E' Street would pave over part of the wetlands was a change in circumstances . . . . By definition, that unaddressed encroachment involved a new significant effect because it eliminated a portion of the wetlands thereby restricting the range of a rare or endangered plant. (See Guidelines, § 15065.)" (165 Cal.App.3d at p. 364, fn. omitted.)

In addition, *Mira Monte* deals with discovery of previously unidentified significant impacts prior to certification of an original EIR. (See *Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at p. 1073.) *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342], also relied on by Fund, is similarly distinguishable. There, prior to final certification of an original EIR, the document was substantially revised to respond to comments by the public during the review process. The court held the failure to recirculate the revised version of the original EIR constituted a violation of CEQA. (*Id.* at p. 823.) The case did not involve an issue as to whether a subsequent or supplemental EIR was required after an original EIR had been fully processed.

To require preparation of a subsequent or supplemental EIR, the change in the project or the circumstances surrounding it must not only be substantial, it must require major revisions of the EIR. (§ 21166.) In the parlance of the CEQA Guidelines, there must be subsequent changes to the project or in the circumstances surrounding the project which "require important revisions of the previous EIR . . . due to the involvement of *new significant environmental* impacts not considered in a previous EIR." (Cal. Code Regs., tit. 14, §§ 15162, subds.(a)(1) & (2).) The term "significant effect" on the environment is defined in the Guidelines as "a substantial, or potentially substantial, *adverse change* in any of the physical conditions within the area affected by the project . . . ." (Cal. Code Regs., tit. 14, § 15382, italics added.) The record does not reflect an *adverse change* in any of the *physical conditions* within the area of the Nichols site. Fund stresses the impact of helicopter flights on a wilderness park. But the helistop was part of the original plan and the number of flights into and out of the site have not been increased.

In short, the only real change is the fact the site is now surrounded by, rather than adjacent to, a wilderness park. The essence of Fund's argument is disappointment over the county's policy decision to proceed with the project at all now that the site is in the middle of the park. But that decision is beyond the scope of these proceedings.

The record contains substantial evidence supporting the county's determination that a supplemental or subsequent EIR was not required.

## IV

### Findings

 Fund claims the Board should have made new written findings pursuant to section 21081 in connection with its 1986 use permit approval. That section provides: " . . . no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings: [¶] (a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. [¶] (b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency. [¶] (c) Specific economic,

social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

In fact in its resolution adopted December 17, 1986, the board made findings including the following: "That Final EIR 234, previously certified by findings on November 24, 1981, and Addendum IS 86-132 were considered prior to approval of the project. Together they were determined adequate to serve as a Program EIR for this project and satisfy all the requirements of CEQA. Addendum IS 86-132 does not raise important new issues about the significant effects on the environment but rather clarifies, refines, makes minor modifications and updates the information considered in the original approval and EIR 234 and makes appropriate minor modifications to the mitigation measures contained therein. The Program EIR is hereby certified for this project and the findings readopted."

Findings pursuant to section 21081 were made in connection with the original approvals of the conditional use permit in 1981. The question here is whether new findings under that section are required when the lead agency properly determines that an addendum is an adequate environmental document to address proposed changes in a project. It must be remembered that an addendum is prepared where "(2) Only minor technical changes or additions are necessary to make the EIR under consideration adequate under CEQA; and (3) The changes to the EIR made by the addendum do not raise important new issues about the significant effects on the environment." (Cal. Code Regs., tit. 14, § 15164, subd. (a).)

Nothing in the Code or the Guidelines suggests new findings are required when an addendum is prepared. Here the "unavoidable adverse impacts" described in the addendum are the same as those described in the original EIR. If the significant effects as found in the original EIR have been addressed by findings, and an addendum is only proper where no new significant environmental impacts are discovered, why should new findings be required in connection with preparation of an addendum? The only purpose of findings is to address new significant effects to show the lead agency has properly considered ways in which to mitigate or avoid such effects. (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1034-1035 [185 Cal.Rptr. 41].)

We hold new findings were not required in connection with approval of the addendum in this case or that the Board's readoption of the 1981 findings was in compliance with CEQA requirements.

## V

### *Consistency With General Plan*

 Finally Fund contends the Board's approval of the Nichols project should be set aside because the approval is inconsistent with the county's own general plan.

In 1981, the Board adopted a new general plan category designated "Research/Open Space Park," as a subcategory of the Open Space Element. This designation was apparently adopted specifically to cover the Nichols project "and other similar land uses in close proximity to natural open space areas." In 1983, the Board adopted a zoning specification consistent with the new general plan category. Neither of these actions was challenged by Fund or anyone else. The Research/Open Space Park designation is described in the general plan as: "An open space category wherein a mixture of less intense industrial and long term open space uses are permitted. Within these areas, employment uses on large building sites would be permitted when those uses are consistent with the open space character of the area. [¶] The intent is to create opportunities for low intensity high technology, industrial, research and development, office, and educational uses which do not require a commitment of significant urban infrastructure. Generally, building sites within this category should be large and the area covered by structures and parking will not exceed 20% in order to blend development in with the natural open space. Innovative design solutions are encouraged to incorporate buildings and parking into the natural features of the site as well as to maximize the efficient use of energy."

The record appears to support the Board's determination that the 1986 version of the project is in compliance with the Research/Open Space Park designation. The Nichols site is a "large building site," that is, 100 acres in size. The project will utilize only 7.6 percent of its 100 acres, considerably less than the 20 percent site coverage allowed. The rest of the land is to be maintained in its natural open state. The proposed facility, the entire development of which is to be phased over an 11-year period, is specifically designed to blend with the natural environment, along with the help of extensive landscaping. The facilities are to be used as a research laboratory for the development of medical tests. Once developed, tests are set up as a regular service procedure. The reference lab will receive samples from hospitals throughout the country which will be analyzed and the results reported to the sending agency. The work proposed to be done on the site appears to come within the designation "low intensity high technology, industrial, research and development, office, and educational uses." Since the project

obviously comes within the definition of a category of the general plan, how can it be inconsistent with the general plan?

Fund contends that the project conflicts with the Land Use Element of the general plan because one of the "Major Land Use Element Implementation Policies" is "[t]o require new development to be compatible with adjacent areas." The actual wording of the policy statement is: "The purpose of the new development compatibility policy is to ensure that new development is compatible with adjacent areas and that it provides either a land use buffer or transition with such areas. Sensitive treatment is required when one urban use transitions to another and when an urban use is introduced into an essentially undeveloped area." As a condition of approval, Nichols dedicated a 150-foot easement for scenic purposes along the Ortega Highway. In addition, mitigation measures proposed, in addition to maintaining the site as over 50 percent natural open space, include the provision for "open space buffers" "where the project interfaces with adjacent lands."

Fund fails to demonstrate how the project fails to conform to the compatibility requirements of the general plan other than to assert, in essence, that no development can be consistent with a wilderness park. But it must be remembered that the Nichols 100-acre site is not park property and never has been park property. Presumably, Fund would be satisfied only if the county were to allow no development on the site. However, we cannot say, on the record before us, that Fund has made a showing the county abused its discretion in determining this development was consistent with the general plan.

The judgment is affirmed.

Moore, J., concurred.

**CROSBY, J.**—Dissenting.

Our rivers may be murky, the air opaque, and the Pacific clouded with sewage and sludge; but Public Resources Code section 21166 is as clear as they once were. It requires the preparation of a supplemental environmental impact report in three instances, i.e., where: "(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes

available." (Pub. Resources Code, § 21166.) All three subdivisions are applicable here.

The 106-page addendum to the EIR must be classified as a major revision reflecting both substantial changes in the project and in the circumstances surrounding it, if for no other reason than the project is now to be constructed in the center of a public wilderness park rather than on its periphery. (See, e.g., *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 937 [231 Cal.Rptr. 748, 727 P.2d 1029] [correcting a similar error by the majority of another panel of this division]; *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 364-365 [212 Cal.Rptr. 127]; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024-1025 [192 Cal.Rptr. 325]; *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 822-823 [176 Cal.Rptr. 342].) Also, the expansion of the park obviously meets the definition of "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete . . . ." (Pub. Resources Code, § 21166, subd. (c).)

The majority's attempt to downplay the importance of the public's acquisition of the land surrounding the project—which I would liken to the discovery that an endangered species had returned to a former breeding ground on the site—is unpersuasive. The notion that the impact of the project on the new park land was effectively assessed in the original EIR because the flora, fauna, and topography considered previously have not changed displays an inability to see the forest for the trees. The land in question was private when the report was prepared. The persons primarily interested in the project's impact on the parcel at that time were cattle ranchers. Now, however, the public owns the land and has a *direct* interest in its future. But the public is being denied the right to be heard in that role and to require county officials to defend, if they can, the placement of a major industrial complex smack-dab in the center of a wilderness park: "Above all, CEQA is intended to require decisionmakers to face environmental concerns, and the EIR is the core of the process. [Citations.]" (*Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 353 [194 Cal.Rptr. 203] (conc. and dis. opn. of Crosby, J.).) If the original proposal had been the present reality, the public outcry would have been far greater than it was when the EIR was considered and approved. And even in a

county whose history displays a distinct preference for tract homes and asphalt to meadows and trees, it seems unlikely the project could have ever been approved in its current location.

I would reverse.[1]

---

[1] At oral argument counsel for Nichols launched a desperation attack on appellants *and* the Attorney General of California, who appeared as an amicus in this proceeding, accusing both of seeking to stall the project simply for the sake of delay. But there is not a scintilla of evidence in the record to suggest appellants have anything beyond the public interest at heart, and the Attorney General obviously has better things to do than attempt to forestall industrial development in this state for no good reason. Rather, Nichols, whose failure to proceed for some five years after the EIR was approved allowed the world to change around its proposed facility, is the principal culprit if delay is the accusation.

In any event, appellants and the Attorney General are in good company: As Thomas Jefferson said in a letter to George Washington on May 16, 1792, "Delay is preferable to error." (Shrager & Frost, The Quotable Lawyer (1986) § 50.7, p. 99.) Environmental cases are proof of the point. Environmental errors are very costly; and they are virtually impossible— and almost always expensive—to rectify. Still, where the foes of development have ignored the rules, we have not hesitated to hold against them. (See, e.g., *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194 [200 Cal.Rptr. 855].) When a public entity does not follow the law, no greater tolerance should be afforded.